STATE OF CONNECTICUT *v.* MICHAEL BLACKWELL
(4691)

DUPONT, C. J., SPALLONE and BIELUCH, Js.

Argued November 4, 1986—decision released February 10, 1987

*Joette Katz,* public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief were *Donald A. Browne,* state's attorney, and *Henry Lyons,* assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant appeals from the judgment of conviction, after a jury verdict, of two counts of attempted robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (3) and 53a-49. The sole issue is whether the defendant, in the context of exercising his constitutional right to self-representation, manifested a knowing, intelligent and voluntary relinquishment of his right to counsel guaranteed by both the United States and the Connecticut constitutions. We find no error.

The circumstances relating to the defendant's claim require some elaboration. On April 15, 1985, following a pretrial conference, the defendant appeared in court and rejected a plea offer by the state. The defendant's counsel stated that the defendant was charged with two counts of attempted robbery in the first degree and one count of attempted assault in the first degree. When the defendant rejected the offer, the court stated: "Okay. I just want to make sure you understand robbery in the first degree is punishable by twenty years in State's prison. You're facing sixty years in State's prison. The offer here is five and a half years for you to serve in return for your plea." The defendant then requested that a different public defender be appointed to represent him and the court denied this request.

On April 24, 1985, the parties appeared in court to begin jury selection. Before beginning the voir dire, the defendant again requested a new attorney, stating that he did not believe that his attorney, William Holden, was handling his case properly. The trial court denied the request, finding that the defendant had presented no specific grounds to be granted a different public defender. The defendant then requested that he be allowed to defend himself. The court stated that the defendant had a right to try his own case, but advised the defendant against doing so.[1] The defendant confirmed that he wanted to defend himself, and the court appointed Holden to act as his advisor.

Holden, over the defendant's objection, then requested the court to consider a competency hearing under General Statutes § 54-56d[2] to determine whether the defendant was competent to represent himself. Holden stated that a psychiatrist, James Alexander, had previously examined the defendant at Holden's request, although not for competency purposes under General Statutes § 54-56d. The court requested that Alexander appear the next morning in court. The court then explained to the defendant the process of selecting the jury, including the use of peremptory challenges, and began the voir dire process with Holden as standby counsel. During a recess, the court explained that Holden would serve as a technical advisor and

[1] "The Court: But I'm also telling you, you're entitled to try your own case. But you've got to—because you're going to try your own case, doesn't mean you're going to get an advantage on the state. You got to follow the same rules of evidence and you're making a huge mistake. They are very serious charges that you are informed against. The state of Connecticut has provided you with a very competent trial attorney. My advice to you, sir, is to use your trial attorney. If you wish to try your own case, I will have Mr. Holden sit here and you could ask him any question you want."

[2] General Statutes § 54-56d is entitled "Competency to stand trial," and sets forth procedures for the court to determine whether a defendant is competent to stand trial when competency is an issue.

make his office available for subpoenas and other technical assistance. When the defendant again objected to Holden, the court suggested that another attorney from the public defender's office where Holden was associated may be able to act as technical advisor. The court then adjourned for the day.

The following morning, April 25, Alexander appeared as ordered. Holden explained that the doctor had performed a psychiatric examination of the defendant to determine whether the defendant had suffered from a mental defect that might serve as the basis for a defense, but that the doctor had not performed a competency evaluation pursuant to General Statutes § 54-56d. The court asked the doctor whether he had examined the defendant long enough to render an opinion as to his competency, and the doctor replied that in his opinion the defendant understood the nature of the charges pending against him and that he was able to assist in his own defense. The defendant also questioned the doctor, during which the defendant stated to the court that he had "not gotten along with [Holden's] tactics as far as being a public defender." Upon questioning by Holden, Alexander testified that he had examined the defendant for approximately forty minutes that morning, that he knew the defendant was planning to represent himself, and that his opinion of the defendant's competency was based on both the time he spent with the defendant that morning as well as his earlier evaluation of the defendant. Alexander also informed the court that a competency evaluation and a psychiatric evaluation involved many of the same procedures.

The court then requested attorney Hubert Bundock to act as the defendant's technical advisor, stating that a breakdown in communications had occurred between the defendant and Holden. The defendant insisted that whether he personally got along with Holden was not

the issue, but that he wanted to represent himself because he didn't believe his case was being handled properly. Bundock stated that he felt the defendant had the intelligence but not the legal skill to defend himself. The court responded that it was obligated under Supreme Court precedent to allow the defendant to defend himself despite the fact that "it's against my better judgment as a lawyer, as a judge and as a human being to allow Mr. Blackwell to try his own case because I think he's hurting himself." The defendant again reaffirmed that he wanted to try his own case.[3] The court found the defendant to be competent to conduct his own defense, on the basis of Alexander's psychiatric examinations and the defendant's confidence in his own competence. Holden was relieved of his duties and Bundock was appointed as the defendant's technical advisor. Voir dire resumed and Bundock was made co-counsel with the defendant's consent. Following voir dire, the court explained that the trial would start the next day, that the prosecution would put on its witnesses first, and that either the defendant or Bundock could cross-examine the witnesses. The court then recessed.

The following morning, before motions were heard, the court explained to the defendant that cross-examination involved certain legal skills and that Bundock was well skilled in this area. The defendant stated that he wished to cross-examine witnesses himself, that he desired Bundock as an advisor rather than

---

[3] "The Court: Do you really want to try your own case?

"Mr. Blackwell: Yes, I do and I would like to study the documents that are available to me and also I'd like to study the fact of my constitutional rights and what's being violated as far as this case is being concerned.

"The Court: Well I was going to give you time to go over with the attorneys, all the motions that have been made for you. I had intended to do that. But do you really want to try your case or do you just want me to appoint another lawyer?

"Mr. Blackwell: No, I would do it myself."

cocounsel, and that he understood that it took great legal skill in defending such a case.[4] Bundock again

[4] "The Court: We're going to be here with Mr. Bundock today. Are you going to allow Mr. Bundock to cross-examine the witnesses?

"Mr. Blackwell: No, I will do the cross-examining.

"The Court: All right. You understand that there is a certain legal skill involved in cross-examining witnesses and in preparing such an examination and the taking of notes and everything else. And that you are in fact, waiving the use of that legal skill. Mr. Bundock who is the chief public defender for this district and has been for many years, who's tried hundreds of cases and is very skilled in this art.

"Mr. Blackwell: I have written down notes of the questions that I wanted to ask. If it's out of the legal bounds, you can correct me.

"The Court: Well see, my job as a judge is to run a fair and unbiased trial. You understand that.

"Mr. Blackwell: Yes.

"The Court: My job is to see to it that you get treated fairly and part of that being treated fairly is that you have good representation and, at your wish, I've switched representation. I have Mr. Bundock here with you.

"Mr. Blackwell: You have Mr. Bundock here as an advisor.

"The Court: Co-counsel, I think we agreed on.

"Mr. Blackwell: I am representing myself as far as the defense is concerned.

"The Court: What?

"Mr. Blackwell: I am representing myself as far as defense is concerned.

"The Court: All right. But you understand you're entitled to an attorney. Do you understand that?

"Mr. Blackwell: Yes.

"The Court: I'm willing to give you an attorney. Do you understand that?

"Mr. Blackwell: Yes.

"The Court: Do you understand that it takes great legal skill in defending a serious case like this. Do you understand that?

"Mr. Blackwell: Yes.

"The Court: And that you are giving up your right to have an expert legal skill do the actual trial. Mr Bundock here—if you want him here to just ask questions, you may.

"Mr. Blackwell: I fully understand all that. I will ask the questions.

"The Court: You understand all that?

"Mr. Blackwell: Yes.

"The Court: Your understanding—

"Mr. Blackwell: I will confer with him as far as the procedures are going and the questions that I might have.

"The Court: All right. But you understand, sir, I'm very concerned that you're doing this?

"Mr. Blackwell: Okay. Thank you. I feel I can."

moved the court to reevaluate the defendant's competency, and the trial judge again found the defendant to be competent even though he had repeatedly warned the defendant that it was unwise to represent himself.[5]

The trial then proceeded, first with pretrial motions, and then with the actual trial. During the trial, the defendant consulted with Bundock regarding both the direct and cross-examination of witnesses. Bundock conducted the cross-examination of one witness and the direct examination when the defendant testified on his own behalf. On Bundock's motion, the assault charge was dismissed and the court included in its jury charge a lesser included charge of attempted burglary. The defendant was convicted of two counts of attempted robbery.

The right to self-representation, long protected in the federal courts, was extended to defendants in state criminal trials in *Faretta* v. *California,* 422 U.S. 806, 819–20, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Our state constitution, article first, § 8, also guarantees this right: " 'In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . .' " *State* v. *Gethers,* 193 Conn. 526, 533, 480 A.2d 435 (1984) (*Gethers I*). In order for a defendant to exercise this right of self-representation, he must

[5] "The Court: Well I've had Dr. Alexander here and he said he's competent and he's got an I.Q. of 130 or 120, 130 he gathers in that range. I've explained to the defendant numerous times that I don't feel it's in his best interests that he defend himself. That I have made, if there is a personality conflict with Mr. Holden whom I feel is one of the finest criminal defense lawyers I've come across. I've given him the opportunity to have the chief of the office here for 20 years. And he keeps turning it down. He tells me he wants to defend himself. And I can't stop him. I've made him aware that I think it's—I think he's foolish. I think he's doing himself harm. I've listened to him. He understands. The jury understands the nature of the charges. He understands what it means to defend himself. You know, I— the old adage about leading the horse to water, if he doesn't want to drink, I can't help it. He's going to get his trial. That's what he's entitled to. All right, bring the jury in."

voluntarily and intelligently waive his right to counsel. *Faretta* v. *California,* supra; *Lyles* v. *Estelle,* 658 F.2d 1015, 1018 (5th Cir. 1981).

Practice Book § 961[6] was adopted to implement the right of a defendant in a criminal case to act as his own attorney. *Gethers I,* supra. In construing § 961, our Supreme Court has stated: "Nothing more intricate than a voluntary and intelligent waiver of counsel is required of an accused to exercise his right to defend himself in person. *Faretta* v. *California,* supra, 835. '[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . [H]is technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself.' *Faretta* v. *California,* supra, 835–36. '[T]o also require a lawyer's expertise as a prerequisite to asserting the right would deny it to all but a small portion of society.' *Lyles* v. *Estelle,* supra, 1019." *Gethers I,* supra, 534.

Subsequently, in *State* v. *Gethers,* 197 Conn. 369, 376–77, 497 A.2d 408 (1985) (*Gethers II*), our Supreme Court added that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that

---

[6] Practice Book § 961 provides: "A defendant shall be permitted to waive his right to counsel and shall be permitted to represent himself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

'he knows what he is doing and his choice is made with eyes open.' " See *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942); see also *Faretta* v. *California*, supra, 835; *Gethers I*, supra.

In determining whether Practice Book § 961 has been complied with, we note that some deviation from a literal application of the rule will not defeat a defendant's right to defend himself. *Gethers I*, supra, 539–40. As our Supreme Court observed in *Gethers I*, in this situation, we are confronted with two fundamental rights of the accused: the right to counsel and the right to represent oneself. "When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. The rule is designed to implement the latter right as well as to protect the former." Id., 534. There is no set, rigid, clearly definable standard by which the court can measure whether an accused has made a knowing and intelligent waiver. The court must determine from the facts and circumstances of the case whether Practice Book § 961 has been satisfied.

The defendant questions the trial court's compliance with subsections (2), (3) and (4) of Practice Book § 961. It is apparent that the court had satisfied subsection (1) since the court had in fact appointed counsel for the defendant, which counsel the defendant subsequently rejected. Similarly, a review of the record reveals that the court substantially complied with the requirements of subsections (2), (3) and (4).

Practice Book § 961 (2) requires that the defendant "possess the intelligence and capacity to appreciate the consequences of the decision to represent himself . . . ." There were ample grounds for the trial court to conclude that this requirement was met. An examining psychiatrist testified that the defendant was com-

petent to assist in his own defense. His testimony was based in part on an examination undertaken on the day of his testimony. While the psychiatrist did not conduct a competency examination according to General Statutes § 54-56d, the court was not obligated under Practice Book § 961 (2) to order such an examination. The psychiatrist did, however, testify that the procedures he used in examining the defendant were similar to those required under General Statutes § 54-56d. There were representations of counsel that, although the defendant lacked legal knowledge, he nonetheless had the intelligence to defend himself. The defendant's ability to understand the court's instructions of how and when to proceed is apparent from his handling of the voir dire in the jury selection process, his questioning of the witnesses and his reliance on court appointed standby counsel, not only for procedural advice, but also as to what questions to ask at various stages of the proceedings. Also illustrative of the defendant's degree of knowledge and appreciation of the case was the reason he gave for wishing to dismiss his court appointed counsel, i.e., that counsel was not handling his defense properly and that he had "not gotten along with his tactics." This assertion indicates that the defendant was waiving his right to counsel because of a disagreement in strategy rather than ignorance of the consequences of self-representation. He disagreed with counsel and wanted to set forth his own theory of defense.

Practice Book § 961 (3) requires the court to ensure that the defendant "[c]omprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case . . . ." This requirement was also adequately satisfied. At his appearance in court, where the defendant rejected a proposed sentence of five and one-half years, his attorney and the

presiding judge informed him of what the charges were and that the defendant faced the possibility of sixty years in jail. In addition, the trial court may appropriately presume that defense counsel has explained the nature of the offense in sufficient detail. *Gethers I,* supra, 537, citing *Henderson* v. *Morgan,* 426 U.S. 637, 647, 96 S. Ct. 2253, 49 L. Ed. 2d 108 (1976). The court also explained the general nature of voir dire, pretrial and trial proceedings to the defendant, and ensured that an attorney was always available who could advise the defendant regarding the nature and conduct of the proceedings.

Finally, the transcript is replete with instances where the court warned the defendant of the dangers and disadvantages of self-representation, thereby complying with Practice Book § 961 (4).

We note that the trial court insisted that standby counsel be present during all stages of the proceedings and that the defendant frequently consulted with counsel and acted upon his advice.[7] Thus, even though the court allowed the defendant to represent himself, it never deprived him of the assistance of state appointed counsel.

Under the facts and circumstances in this case, we conclude that the record sufficiently demonstrates a reasonable basis for the trial court to have been satisfied that all of the requirements of Practice Book § 961 had been fulfilled and that the defendant's waiver of counsel was both voluntary and intelligent. The trial court, therefore, properly allowed the defendant to exercise his constitutional right of self-representation.

There is no error.

In this opinion the other judges concurred.

---

[7] The defendant had no right to "hybrid representation" under either the state or federal constitutions. *State* v. *Gethers,* 197 Conn. 369, 382–94, 497 A.2d 408 (1985) (*Gethers II*).