[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
After spending her then two and one-half year lifetime in hospitals or foster care, Hope W., born August 26, 1987, became the subject of this petition filed by the Department of Children and Youth Services (DCYS) pursuant to Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1989) seeking to terminate the parental rights of Cynthia T. and Danny W., her mother and acknowledged father, on three of the four nonconsensual grounds set forth in Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1989) applicable to children previously committed to DCYS as neglected or uncared for. At the initial hearing on March 7, 1990, required to be held within 30 days of the February 10, 1990 filing of such petition, in-hand service was confirmed on the father but not on the mother whose address had historically varied from time to time between the homes of the maternal and paternal grandmothers. Since neither parent appeared, the court ordered service by publication on the mother and summonses to be issued to both parents at the homes of both grandmothers in an effort to procure their appearance in court.
At a continued plea hearing on April 18, 1990 the paternal grandmother, with whom Danny was last known to be living, appeared and stated that notwithstanding her appearance in court, her son was unaware of this hearing. With the concurrence of separate counsel appointed to represent the parents, pro forma denials were entered on their behalf, and again summonses were ordered to be issued for a third plea date on May 9, 1990. On that occasion service was also confirmed on both parents for a subsequently filed petition to extend Hope's original commitment. The father, whose awareness of this third hearing was confirmed in the presence of his attorney, was excused. In the presence, and with the agreement, of Cynthia and her attorney, the commitment of the child was extended effective June 14, 1990, pursuant to subsection (e) of Sec.46b-129, and denials were entered to the allegations of the termination petition on behalf of both parties. A pretrial conference was set for June 11, 1990 at which neither parent appeared. A trial date certain of August 1, 1990 was agreed to by counsel for all parties.
On the first day of trial, Danny failed to appear or to offer any excuse for his nonappearance. No request for CT Page 3751 continuance was made. The afternoon of August 3, 1990 was reserved to complete the trial, but on that occasion a continuance to August 31, 1990 was required on the representation that Cynthia had suffered a grand mal seizure. On August 31, 1990, neither parent appeared. Cynthia first reported being unaware of this hearing, despite a letter from the clerk and two telephone calls confirming it from her attorney, but later stated that she had no transportation from the paternal grandmother's home in New Britain to the court location in Plainville. Because the only anticipated witness (paternal grandmother) was also not present, the request for continuance by counsel for both parents was granted. A firm and final trial date was set for September 19, 1990. On that occasion, again Danny failed to appear. His mother appeared and testified, with Cynthia choosing to remain outside of the courtroom during her testimony. After Cynthia testified, all sides rested and agreed to meet two days later for oral summarization of their positions. On that date, however, due to an emergency court obligation elsewhere by one of the attorneys, all parties agreed to submit written trial memoranda to be completed, with the responses thereto, by November 7, 1990. The period of reserved decision thus commenced on November 7, 1990.
Facts
Evidence offered at two days of trial, interpreted in light of the prior record in this court concerning this child of which judicial notice is taken, supports the finding of the following facts:
Hope W. was born on August 26, 1987, three months premature and weighing 1.5 pounds. She is the only child of her then 24 year old unmarried mother, an unemployed S.S.I. recipient who had always lived at home due to her own complex medical and psychological condition: mentally retarded; suffering from tuberous sclerosis (a propensity to develop brain tumors); subject to seizures requiring constant medication (tegretal, phenobarbitol, Dilantin). Hope's father, unemployed and living with his mother at the time of her birth, did not acknowledge paternity until the child was 14 months old.
At birth, Hope suffered from medical problems of extreme prematurity as well as having inherited tuberous sclerosis. She remained in hospital for her first five months of life, being transferred from a hospital in Hartford to New Britain General Hospital (NBGH) to facilitate visitation with her mother. Notwithstanding this move, Cynthia visited her child only five times in those first five months. When Hope was ready for discharge from hospital, Cynthia gave permission for CT Page 3752 her placement in foster care, acknowledging her inability to meet the child's continuing special medical need's: While no longer on a respirator, Hope needed to be close to a source of oxygen at all times; she was prone to contracting pneumonia, requiring immediate hospitalization; she needed constant developmental monitoring because of a fragile immune system and weakened lungs. To meet these special needs, DCYS home finding was forced to look beyond the child's immediate home area and located a specialized foster home in Enfield with more than five years experience with similarly problematic children. While this home was some distance from the homes of of the parents, grandmothers on both sides offered to provide transportation. The parents were permitted to visit every Saturday morning.
Cynthia did not visit her daughter until May 22, 1988, four months after her initial placement in foster care. Danny, who had only visited Hope once in her five months in hospital, was told that he could also visit once he had acknowledged paternity. He did not do so until the child had been in foster care for nine months. Cynthia visited once a month in June, July and August, but stopped for the next two months without explanation.
Although Danny had not then acknowledged paternity, he was named as a respondent parent on a petition alleging Hope to be neglected (abandoned) and uncared for (homeless and with specialized needs unable to be met by her parents) which DCYS filed in mid-May, 1988. He was given due notice, provided with court-appointed counsel, and included in clinical evaluations ordered on motion of DCYS. On October 26, 1988, in the first court hearing following the securing of such evaluations, Danny acknowledged paternity and thereafter visited Hope for the first time since her placement in foster care (and the second time in her life) on November 12, 1988. Three more visits took place by the end of the year.
In court on December 14, 1988, both parents agreed, with the advice of their separate counsel, that their daughter was uncared for in both pleaded senses: Neither parent then had a home to offer her, nor could they meet her specialized needs (mild retardation: developmental delays; respiratory problems). allegations of neglect, based upon the parents' infrequent visitation to that time, were dismissed without findings. The parents also agreed to the child's commitment to DCYS for an initial period of 18 months (Sec. 46b-129 (d)) and to a list of expectations, fulfillment of which would improve their chances of regaining the child's custody. The expectation form they signed, copies of which were provided to each parent, included this sentence: CT Page 3753
 Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption.
These expectations included weekly visitations, the securing of an adequate source of income as well as adequate housing, and cooperation with assessment of their individual treatment needs at NBGH and thereafter with whatever recommendations might be agreed to at a post-assessment case conference. DCYS agreed to investigate possible appropriate placement for the child closer to where the parents were residing. A date certain for the post-assessment case conference was set at the time of commitment to be held on April 11, 1989, a date far enough in the future to ensure the prior securing of the parents' needs assessment.
In the first two months following committment, the parents visited four more times, twice in January and twice in February. Without explanation or request for assistance, they stopped visiting for six weeks. Their last visit prior to the case conference was on April 8, 1989. The case conference was attended by all parties and counsel of record. The parents had done nothing to secure the needs assessment, without which their potential for meeting Hope's needs could not be gauged, and therefore DCYS had not sought to move the child from the specialized placement where she appeared to be receiving excellent care. The parents were told in that case conference, in the presence of their attorneys, that if the needs assessment appointment had not been made by them in one month, DCYS would initiate a proceeding to terminate their parental rights.
Although the parents never made that initial appointment for the needs assessment, and never visited the child again, DCYS did not, in fact, file a petition to terminate their parental rights until February 10, 1990, more than 10 months after the case conference. During this 10 months, further efforts were made to encourage them to initiate contact with NBGH, and no restriction was placed upon their continued visitation. A treatment plan was prepared announcing the agency's intent to file a termination petition within the next six months, a copy of which, together with an invitation to attend an administrative review of the plan, was sent to the parents. Neither appeared at the administrative review (as they had done the year before), and no response to the plan was elicited in the way of protest or resumption of visiting. Because neither parent made any further effort to see the child or secure the needs assessment, a review in court was scheduled CT Page 3754 for the purpose of, again, warning them of the consequences of their continued inaction. Neither parent appeared at the in-court review on October 25, 1989, although both were aware that it had been scheduled: They called the court at the time set for the hearing and said they lacked transportation from New Britain to Plainville and therefore would not attend. Once again, DCYS announced its intent to file a petition to terminate the parents' rights so that Hope might have a permanent home.
From the time of commitment, fourteen months before the termination petition was filed, it was made clear to both parents that the needs assessment at NBGH was critical to any plan of reunification. The social worker provided them with the information as to whom should be called and what was the telephone number and address. From the outset they were told that they would have to make the initial contact on their own. No such contact was ever attempted by either parent after the commitment hearing of December 14, 1988, or after the case conference of April 11, 1989, or after the in-court review of October 25, 1989. The parents were invited to attend treatment plan administrative reviews in February and August of 1989, at which was discussed the plan for termination upon the parents' continued failure to visit or to secure the needs assessment. They attended neither. Notices of such reviews were sent to each parent at the home of their respective families, in the absence of any other address having been communicated to DCYS. Such notice had been sufficient to secure their participation in the first administrative review after Hope's placement in foster care which took place in March of 1988, but with the same notice, they failed to appear at any other administrative reviews thereafter. (Testimony of social worker, August 1, 1990.)
From the outset of the foster placement both maternal and paternal grandmothers had offered to provide transportation for visits. At no time, according to the grandmothers, was, this offer ever withdrawn. The parents never asked the social worker for transportation assistance, and when the social worker offered to drive them to the foster home for visits with the child when being seen by a Department of Mental Retardation worker, the parents did not accept.
After Danny acknowledged paternity, his mother expressed an interest in providing a home for Hope. The social worker explained that it would be necessary for her to be licensed, a process necessitating the submission of fingerprints for a police check. Expressing doubt as to why this was deemed necessary, she was told to think it over and return to DCYS if she decided she wanted to become licensed. She never returned. CT Page 3755 The maternal grandmother never offered her home for Hope, but remained willing to drive the parents for visits. (Id.)
Cynthia gave multiple explanations for her failure to visit the child after April 8, 1989. She testified on September 19, 1990 that her mother had suddenly refused to take her, but the maternal grandmother was not called to substantiate this. Asked why, then, Danny's mother had not driven her there, she answered that she had never asked, although she testified she had been living with Danny in his mother's home for months before giving her testimony. Many other aspects of her testimony suggested the level of her confusion:
 — She failed to secure the needs assessment appointment because "no one made appointments for me," despite the fact that at the case conference on April 11, 1989 she had agreed to call the social worker or her attorney "with date of assessment" when that date had been made. (Petitioner's Exh. C.) Later she testified, "I understood that I was supposed to make the appointments," but have no reason for her failure to do so other than that she had forgotten the name of the person she was supposed to call; — She gave Hope's birth date as August 26, 1979 instead of August 26, 1987; — She recalled that Hope had stayed in St. Francis Hospital in Hartford for six months after birth, and thereafter moved to NBGH to make visiting easier for her. In fact, however, Hope had been moved from St. Francis to NBGH and discharged to foster care, all within five months.
She admitted she had only visited Hope twice in her NBGH stay, despite the fact that the hospital move had been made solely to facilitate such visits. She also admitted that the social worker had offered to drive her to the foster home twice when the Department of Mental Retardation worker would be there, and that she had never accepted the offer, but gave no reason why not. Asked directly if she now felt able to meet Hope's special needs, she replied, "I don't know," admitting that she had never tried to learn just what those needs were.
No party moved for a court-ordered evaluation or funds with which to secure an independent evaluation in this proceeding. The court had access to evaluations by both a psychiatrist, Dr. Sadler, and clinical psychologist, Dr. Mantell, prior to the commitment of the child in December of 1988. Dr. Sadler had seen Cynthia as limited intellectuality, suffering from a "poorly controlled seizure disorder which CT Page 3756 requires multiple anti-seizure medications in order to achieve partial control," seriously impaired in her judgment of her own abilities and those of the father, with poor appreciation of the demands of caring for this infant on a full-time basis: "She is intellectually impaired and she has no appreciation of her limitations." He found Danny evidencing "serious lapses in judgment and serious deficits in his ability to function in a consistent or caretaking capacity," unwilling to clarify many areas of his lift or to acknowledge any past deficiencies in his relationship) with Hope. Neither parent had a parent-child relationship with Hope (he found Danny to have no relationship), or demonstrated any ability to care for this child. Neither parent saw the need for any supportive services or admitted to any deficit in their ability to parent a child. He found Cynthia unable to meet her own needs without external supports, and unable to care for any child for more than a matter of hours. Her seizure disorder any current medications were likely to interfere with her ability to care for a child. Danny lacked the ability to establish a stable relationship with any adult or child, and gave no indication of ever becoming a responsible caretaker for Hope. Dr. Sadler found the impairments in the parenting capacity of both parents unamenable to change through therapy: "Neither parent appears able to modify their own behavior or to offer any reasonable hope of their adequately caring for their daughter in the future." (p. 12). (Evaluation of Dr. Richard Sadler, report dated September 6, 1988.) Dr. Mantell, clinical psychologist, saw the mother and maternal grandmother with Hope in August of 1988. Danny failed to attend that evaluation. Based on his observations and review of the records, Dr. Mantell recommended that the child remain in the foster home as a committed child and that "permanency planning begin at the earliest possible date in order to ensure clarity regarding the child's future status and in order to eliminate all obvious sources of insecurity for the child and her caretakers." (p. 5) Two years before the trial on the instant petition, after only seven months in the foster home, Hope was observed to be already bonded with the foster mother.
In the absence of any counselling, therapy or treatment of any kind for either parent, and given the total cessation of visitation after April 11, 1989, (after a brief flurry that had produced ten visits in six months) the findings of these clinicians in 1988 are unlikely to have changed in two ensuing years.
Conclusions of Fact
1. Hope W. is a child with special needs caused by extreme prematurity, inherited tuberous sclerosis, respiratory CT Page 3757 difficulties, foetal dilantin Syndrome, mild mental retardation and developmental delays. She requires a high degree of careful parenting.
2. The parents are unable to meet their own needs — neither has had any consistent employment history or demonstrated the ability to live apart from their own parents since Hope was born.
3. Elope's mother suffers from a seizure disorder requiring multiple medications. She is unable to meet her own needs without the external support of her own mother.
4. Neither parent was willing or able to initiate a needs assessment, without which their treatment needs, their motivation to engage in treatment, and their amenability to treatment could not be predicted. 5. In her three years of life, including her first five months in the hospital, Hope has seen both parents only a dozen times; her mother without the father another four times. In the year before the adjudicatory date of August 1, 1980, neither parent visited at all. 6. Hope's father refused to acknowledge paternity until the child was 14 months old, visited the child 10 times after he did acknowledge, and failed to participate in the court proceedings held in connection with this petition.
Adjudication on 8/1/90, the date the petition was last amended
The factual conclusions reached above support by clear and convincing proof all three of the alleged grounds for terminating the parental rights of both Cynthia and Danny: (1) Abandonment — The total cessation of all visitation, calling, or communication of any other kind with the child for a period of 16 months prior to the adjudicatory date constitutes not just abandonment is defined by the applicable statute, but also at common law. Apart from impugning the veracity of the witnesses who testified in support of these facts, Cynthia has "failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child"; Danny did not come to court, even for the purpose of denying the testimony of those who did.
(2) Failure to Rehabilitate — The two essential expectations set forth for the parents if reunification with their daughter could ever be considered were regular visitation and cooperation with an assessment of their own needs, followed by cooperation with whatever treatment was recommended in such assessment. Visitation was regular (twice monthly) for only four months out of the 20 between the date of commitment and CT Page 3758 the adjudicatory date; for the 16 months before the adjudicatory date, there was no visitation. Despite repeated reminders and warnings of the consequences of failing to secure the needs assessment, neither parent made any effort to do so, and no reason was ever offered for their failure to do so. Neither parent has secured employment, although Cynthia is a recipient of Supplemental Social Security for her own support. Neither parent has achieved housing apart from their own mothers. Their situation is exactly as it was in December of 1988 except that visitation, which had taken place to a limited extent prior to commitment, stopped altogether four months after commitment. This constitutes clear and convincing, if not overwhelming, proof that both parents "have failed to achieve such degree of personal rehabilitation as would encourage the belie that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child."
(3) No ongoing parent-child relationship: Two clinicians observed that no such relationship existed in 1988, nearly two years prior to the adjudicatory date. During more than half of this period neither parent has seen the child. It does not take a clinical expert to conclude from these facts that whatever relationship might exist on August 1, 1990 between Hope and either parent, it cannot be "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child," within the meaning of subsection (b) c)f Sec. 17-43a. Considering the parents' apparent diminution of interest in their child, manifested by the cessation of all contact after April 11, 1989, and their continued failure to participate in the assessment of their therapeutic needs, much less in the therapy that would be required if any change could be made in their functioning, it is clear that. "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." If Dr. Mantell recommended two years before the adjudicatory date that permanency planning was essential for the child at that time, it could only be more of a necessity now that the child is older.
Disposition — as of 9/19/90, the final date of trial
No change in circumstances took place in the six weeks between the adjudicatory and dispositional dates, except that the father continued to stay away from court, and the mother missed two scheduled court dates because of a seizure on August 3, 1990, and because she failed to secure transportation on August 31, 1990. Before the court may consider termination, however, it must consider the six factors set forth in CT Page 3759 subsection (d) of Sec. 17-43a:
(1) Hope had to spend her first five months of life in hospital. She was moved from one hospital in Hartford to another in the town in which Cynthia lived to facilitate visitation and the learning of the multiple complex aspects of Hope's care. Despite the move, Cynthia — unencumbered by employment or other children — only visited two times. She saw her daughter a total of five times in the five months before Hope was able to leave for home care. After placement in foster care, Cynthia was offered transportation to the foster home at least twice on occasions when mental retardation specialists would be visiting. She never accepted this offer. Since the parents were barely able to meet their own needs, an assessment of those needs, with recommendations for the kind of help they would need to enable them to care for Hope was an essential first step. Despite instructions to do so from the Social worker, the inclusion of such assessment in written expectations provided at the time of commitment, a case conference and an in court review — both scheduled to urge compliance with this expectation — they did not do so. No satisfactory explanation was ever given.
No services can be offered to a putative father who refuses to acknowledge paternity. After Danny did so, when Hope was 14 months old, he was permitted the same visitation as was the mother, but exercised his right to do so no more than she did. Under all of these circumstances, no further services were appropriate to facilitate reunion of the child with either parent.
(2) The only court orders entered in this case were for cooperation with clinical evaluations and attendance at court hearings. Cynthia complied with both, except when offering the unanticipated lack of transportation for her failure to come to court. Danny failed to keep appointments with the psychologist in 1988, although he was seen by the psychiatrist, or to attend any of the court hearings in connection with the instant termination proceeding. While not court orders, the court did spell out expectations for the parents if they hoped ever to assume care of their daughter. They complied with none of them: They stopped visiting. They failed to obtain the needs assessment. They have never acquired housing other than with their own parents. Their only source of income is Cynthia's SSI award.
(3) Two years before the adjudicatory date, the foster mother was observed to be providing excellent care under which this special needs child was thriving. Whatever emotional ties of which she is capable are with this caretaker. Not having seen CT Page 3760 her parents for the last half of her three-year life, it is reasonable to infer that she can have no feelings for or emotional ties with either of them.
(4) Hope W. is three years old, making significant progress in the only home she has ever known. Two years ago, the clinical psychologist recommended permanent planning for this child as quickly as possible. She should not be compelled to wait any longer for the possibility of eventually being cared for by either parent when there is no basis in the record for such possibility.
(5) The parents have made no effort to adjust their circumstances, conduct, or conditions to make it in the best interest of this child to return to either of their homes in the foreseeable future. Their visitation, dependent as it was on being driven by relatives or the DCYS social worker, at best was twice a month. With no evidence that their transportation resources during that period (November 1988 through February 1989) had dried up, they stopped all visitation on April 8, 1989. They were repeatedly told that their parental rights would be subject to termination if they failed to visit consistently. The excuse offered, that visitation in the foster home made them uncomfortable, is illustrative of the fact that it is impossible for them, given their own limitations, to put their child's best interests ahead of their own. Further, neither parent communicated with the DCYS social worker when they moved it was only learned at time of trial that Cynthia had lived for the past year with Danny's mother rather than with her own.
(6) The parents argue that the distance between the foster home and where they lived was an inhibiting factor in maintaining a meaningful relationship. Certainly dependency on others for transportation is a barrier to regular, consistent, frequent visitation. This factor, however, cannot defeat the relief sought by the petitioner in this action:
— Even when the child has been moved to a hospital in New Britain, the parents failed to visit regularly or frequently. despite the extreme fragility of the child which necessitated hospitalization for her first five months, Cynthia visited only twice and Danny only once when Hope was in a hospital in New Britain.
— The parents demonstrated between November of 1988 and February of 1989 that they could get themselves to the foster home at least on a bi-weekly basis. They gave no substantiated valid reason for the decrease of visits to once a month in March and April of 1989, and the total cessation of visits for CT Page 3761 the nearly eighteen months preceding the dispositional date.
— Hope was placed in Enfield not to discourage the visitation by the parents, but because it was the only then available foster home with sufficient experience and motivation to meet the extraordinary needs of this fragile child. While DCYS was instructed to look for a comparably capable foster home nearer to New Britain, the parents' failure to take even the first steps toward any possible reunification was a reasonable justification for Hope's placement, in which she was thriving, to be left undisturbed.
— Even if this court were to find that the parents were prevented from maintaining a meaningful relationship with the child by the unreasonable conduct of DCYS or by their economic circumstances, the remedy is not to deny the child permanency in an adequate adoptive home but rather to withhold federal foster care subsidies. In a similar situation, a mother had claimed that DCYS failed to make reasonable efforts to reunify her with a child placed out of the parent's home, citing the Adoption Assistance and child welfare Act of 1980 (P.L. 96-272,42 U.S.C. § 671(15) and 672(a)(1)). The Connecticut Appellate Court found this no barrier to the trial court acting in the child's best interests:
 The act, however, is an appropriations act and does not apply to individual actions or judicial findings as the respondent argues, but merely sets forth general guidelines for a state's continued eligibility to receive funds for foster care maintenance.
In Re Cynthia A., 8 Conn. App. 656, 664 (1986), cited with approval In Re Carl O., 10 Conn. App. 428, 436-437 (1987). Any other interpretation would make the child pay a lifelong penalty for governmental malfeasance. Just as necessary permanency may not be denied where the unintended parental failures are due to mental deficiency or illness, In Re Nicolina T., 9 Conn. App. 595, 605 (1987) so it may not be denied where an administrative agency fails to perform optimally from the parent's point of view.
Having considered the foregoing, it is found by clear and convincing evidence to be in the best interests of this child for her parents' rights to be terminated so that she may be placed in the secure and nurturing permanent home of adoptive parents, if not with the present foster family than with one equally capable of meeting her longterm special needs. Therefore it is ORDERED that the parental rights of Cynthia T. and Danny W. in and to their daughter, Hope W., be and hereby CT Page 3762 are terminated. And it is further ORDERED that the Commissioner of DCYS by appointed statutory parent for the purpose of placing the child forthwith in adoption and that such Commissioner shall submit a written report as to the progress toward such adoption no later than 90 days after the date of this judgment, and thereafter in such form and at such frequency as this court may from time to time require. It is further ORDERED that in the event adoption of this child is not finalized on or before March 1, 1992, such Commissioner shall file with this court a Motion for Review of Terminated Child in compliance with federal law.
Appeal
The parents have 20 days from the date of this judgment in which to seek an appeal. If, after being informed by their trial counsel of the court's judgment and their right to take an appeal, they affirmatively manifest a desire to do so, if such trial counsel is willing to act in that capacity, the court will appoint him or her for this purpose. If either respondent manifests a desire to take an appeal and if trial counsel declines to represent the parent because in his or her professional opinion it lacks merit, such attorney is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the parent on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent parent will be informed by the clerk forthwith of the balance of the extended appeal period in which to secure their own counsel who, if qualified, may be appointed to represent that parent on the appeal. If this is not done, then upon expiration of the extended appeal period, the right to pursue an appeal will be ended and the termination of parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise her is at issue. Even unsuccessful appeals delay permanent planning for year since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action CT Page 3763 against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Plainville this 26th day of November 1990
BRENNEMAN, Judge