428

IN RE CARL O.*
(4578)
(4579)

DUPONT, C. J., HULL and SPALLONE, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 15—decision released April 14, 1987

*Melissa A. Buckley,* for the appellant (respondent mother).

*Lawrence A. Dubin,* for the appellant (respondent father).

*Michael O'Connor,* assistant attorney general, for the appellee (commissioner of children and youth services).

*Victor Carlucci, Jr.,* for the minor child.

SPALLONE, J. In these consolidated appeals the respondents, the mother and the father of the minor child, Carl O., are appealing from the judgment of the

trial court committing the child to the commissioner of the department of children and youth services (DCYS) for a period not to exceed eighteen months.[1]

Carl O. was born to the respondents, Pamela V. and Merritt O., on November 6, 1984. On November 15, 1984, DCYS filed a petition in the Superior Court pursuant to General Statutes § 46b-129 (a) alleging the child to be neglected and uncared for. On the same date, DCYS also sought and was granted an ex parte order of temporary custody. This order was confirmed on January 8, 1985, after three days of hearings.[2] See General Statutes § 46b-129 (b). After numerous pretrial motions, trial commenced on April 26, 1985, and was concluded on July 2, 1985. The court rendered judgment on October 8, 1985.

The facts, as found by the trial court, are essentially as follows. Carl O. was the fourth child born to Pamela V. Parental rights in her three other children had been terminated and the children placed in adoption because Pamela's long standing mental illness prevented her from caring for her infant children.

After Carl's birth, the attending physician asked the parents routine questions regarding preparations for the baby's care upon his discharge from the hospital. This query was greeted by total silence from the mother and death threats to the physician from the father. The

---

[1] The minor child, Carl O., has been represented by counsel throughout these proceedings. On appeal, counsel for Carl O. has agreed with DCYS and has adopted its brief.

[2] In granting temporary custody, the court found that the child "would have been imminently endangered in view of the uncontradicted evidence of parental incapacity." Under the order of temporary custody, either respondent was allowed to seek an opening of the order at any time provided he or she filed an *offer of proof of changed circumstances,* such as an improvement in the condition of the mother or suitable child care proposals of the father. Between the date of the order and the date of the trial on the petition for commitment six months later, however, no such offer of proof was made.

father also threatened other members of the hospital staff and such threats alarmed the staff to the extent that some of them removed their identification badges. In addition, the father seemed to be preoccupied with the astrological signs accompanying Carl's birth and showed no concern for any planning required for the care of the newborn child. The father's verbal responses and his behavior indicated that he was content to leave the care of the child to the mother.

While the mother was still in the hospital after the delivery of the child, she acted confused. At times, she interacted with the baby and at other times she failed to respond to the baby's needs. Sometimes she would react to the doctor, but at other times she failed to make a verbal response or to maintain eye contact. On occasion, she seemed to be unaware of the baby's distress. For example, on one occasion, the baby lay choking on her lap for as long as ten to twenty seconds but she did not respond until a staff member intervened. She appeared to hear the nurse's instructions, but made no change in her behavior or attitude toward the child. According to the attending physician, the mother required "a lot more than average" supervision when the baby was entrusted to her care. This fact, according to the physician, was "a major concern to pediatricians and nurses," leading the staff to fear that she might forget that the baby was there at all.

Before the birth of the child, Pamela had displayed aberrant behavior during her prenatal visits to the hospital. She would sit with her head bowed, refuse to wait long enough to take a prescribed blood test, and showed signs of nervousness, anxiety, incoherence and unresponsiveness. This pattern of behavior continued after the child's birth and during DCYS's attempt to establish parental ties through visitations. Pamela's mental condition required that she be admitted to Con-

necticut Valley Hospital soon after the child was born. There was no change in her attitude towards the child upon her release from this hospital.

The father acted in a detached manner towards the child. He did not seem to appreciate the limitations on Pamela's ability to care for the child. Even before the child's birth, he threatened a social worker with bodily harm, accusing her of wanting to take children away from parents. After the birth, when the social worker attempted to speak to both parents, Merritt became so violent and loud that other patients on the floor became alarmed. He also threatened to kill the social worker. When Pamela was committed to Connecticut Valley Hospital, he offered no plan to care for the baby but expressed a willingness to place the baby in foster care until the mother's release. During the visitation sessions, Merritt displayed little interest in the child, concentrating his attention on the other adults present and frequently discussing astrology.

Two court appointed evaluators, a psychiatrist and a pediatrician, concluded in a joint report that "neither parent gave any indication of being capable of meeting the complex demands presented by child care" because of their minimizing "to an extreme degree" the problems entailed in the care of an infant. They also concluded that "their lack of insight and suspiciousness would make it extremely difficult for them to profit from even an intense remediation program." Merritt was found to be disorganized, guarded, suspicious and lacking insight into the realities of his own life or the needs of the baby. Pamela fared no better. She too, like Merritt, was disorganized and suspicious, but was, in addition, withdrawn, preoccupied and confused.

The pediatrician found the baby, Carl, to be more than ordinarily sensitive, needing a caretaker with more than normal child care skills, one able to ascer-

tain immediate needs and make appropriate responses. Further, the pediatrician concluded that it would be "a hazard to his development" if the child were cared for by his parents.

In a well reasoned, legally sound and meticulously detailed memorandum of decision the trial court expressly found the following facts. Pamela suffers from chronic mental illness with a long history of repeated hospitalizations followed by an established pattern of discontinued medication and outpatient therapy after each discharge. Merritt, while not psychotic, has a history of institutionalizations, economic dependency, and disorganized thinking. The relationship between the parents is stormy. While Pamela passively permitted Merritt to take charge of their lives, she resisted his efforts to see that she received psychiatric treatment and several times accused him of physically abusing her. Both parents lack insight, evidence minimal judgment, are guarded, suspicious, resistant to instruction in child care, and have unreal expectations of a baby. These characteristics render them incapable of either acquiring the necessary "knowledge base" normally acquired from experience of actually caring for a child, or benefiting from community resources. The child, since birth, has always received excellent child care from others than his biological parents, first in the hospital and later in foster care under an order of temporary custody. But for the intervention of the hospital and DCYS in preventing the parents from exercising custody, Carl would have been denied adequate care and would have been in danger of serious injury from the date of his birth.

The court concluded on the basis of a preponderance of the evidence, that Carl was "uncared for" as defined in General Statutes § 46b-120. Thereupon, the court rendered judgment committing Carl to the commis-

sioner of DCYS for the statutory eighteen month period. See General Statutes § 46b-129 (d).

From the court's judgment, the parents have each filed an appeal, which have been consolidated, and claim, essentially, that the trial court erred (1) in granting and confirming the order of temporary custody, (2) in holding that Carl O. was "homeless," (3) in holding that Carl O. has "special needs," (4) in denying Pamela's motion to enforce rights, (5) in granting DCYS's motion to amend, (6) in interpreting General Statutes §§ 46b-129 and 46b-120 in a manner that is unconstitutionally vague and overbroad, (7) in refusing to find that General Statutes § 46b-129 was in violation of the due process clauses of the United States and Connecticut constitutions, and (8) in rendering a judgment of commitment where such decision was not supported by the evidence. We find no error.

The respondents' first claim of error is that the court erred in granting and confirming the award of temporary custody. Any issues involving the order of temporary custody, however, are moot because that order expired when the child was later adjudicated an uncared for child and was committed to DCYS for the statutory period. The order of temporary custody is therefore academic. Appellate courts will not consider academic questions, particularly where no appropriate relief may be afforded. *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union*, 177 Conn. 17, 19, 411 A.2d 1 (1979).

In the second and third claims of error, the respondent father claims that the trial court erred in finding that the child was "homeless" and that the parents could not "provide the specialized care which his physical, emotional or mental condition requires." The court made these findings when determining pursuant to General Statutes § 46b-129 (d) whether the child was

"uncared for" as alleged in the petition. The term "uncared for" is defined in General Statutes § 46b-120 as follows: "a child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires." The trial court found that the child was "uncared for" under both the "homeless" and "specialized care" sections of the statute. We review only the claim that the court erred in concluding that DCYS had established that the child was "uncared for" under the "specialized care" section of the statute, since our decision that the court did not err in this finding is sufficient to sustain the court's conclusion that the child was "uncared for" under General Statutes §§ 46b-129 (b) and 46b-120. See *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 69, 454 A.2d 1262 (1983); *In re James T.*, 9 Conn. App. 608, 619, 520 A.2d 644 (1987).

The respondent father claims that the trial court erroneously concluded that the child had "special needs" merely because he was an infant. This claim misconstrues the trial court's memorandum of decision. The trial court found that the child required specialized care both because of his infancy and his particularly sensitive nature. The court further found that his parents were not capable of providing that care.[3] The evidence fully supports these conclusions. The pediatrician examining Carl found him to be more than ordinarily sensitive, requiring a caretaker who could detect and

---

[3] The court found: "All babies have special needs that are not shared by older children capable of meeting many of their own needs. Babies are totally dependent upon adult caretakers for every detail of their existence, and a parent capable of caring adequately for a 10 year old, or even a five year old, might not be capable of caring for an infant. In addition, Carl at less than five months of age, was an extraordinarily sensitive baby, needing more than the usual degree of appropriate responsiveness from his adult caretaker. Neither Pamela nor Merritt was capable, as of the time of filing the amended petition, of providing this special care. Carl O. was, therefore, uncared-for in the sense of having parents incapable of providing the care required to meet his special needs."

respond to his immediate needs. Furthermore, there was expert testimony that even with "an intensive remediation program" the parents would not be able to minister to the child's needs. " '[W]e are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the [trial court] when they are based on reliable evidence.' " *In re Theresa S.*, 196 Conn. 18, 27, 491 A.2d 355 (1985), quoting *In re Juvenile Appeal (83-BC)*, supra, 77. We find no error in the court's conclusion that the child was "uncared for" because the parents could not provide the specialized care which his physical, emotional or mental condition requires.

In a fourth claim of error, the respondent mother claims that the court erred in denying her motion to enforce rights. By this motion, the respondent claims that under the Adoption Assistance and Child Welfare Act of 1980,[4] the DCYS was required to make reasonable efforts to reunite the family. This issue was recently considered by this court in *In re Cynthia A.*, 8 Conn. App. 656, 664, 514 A.2d 320 (1986). There we stated: "The act, however, is an appropriations act and does not apply to individual actions or judicial findings as the respondent argues, but merely sets forth gen-

---

[4] The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 672 (a) provides in pertinent part: "Each State with a plan approved under this part shall make foster care maintenance payments . . . with respect to a child who would meet the requirements of section 606 (a) of this title or of section 607 of this title . . . if—(1) the removal from the home occurred pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian, or was the result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child and . . . that reasonable efforts of the type described in section 671 (a) (15) of this title have been made . . . ."

Section 671 of that Act provides in pertinent part: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—(15) . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home . . . ."

eral guidelines for a state's continued eligibility to receive funds for foster care maintenance. 42 U.S.C. §§ 601, 627, and 670–72." *In re Cynthia A.,* supra, 664–65. Furthermore, even if we were to find that this federal act conferred specific rights to the respondents in this situation, the respondent mother has claimed only that the act was violated during the temporary custody proceedings, and not also during the adjudication and dispositional proceedings. As noted above, any claimed errors in the temporary custody proceeding were rendered moot after the child was adjudicated an uncared for child in the later proceeding. We therefore find no merit to this claim of error.

A fifth claim of error is that the court improperly allowed DCYS to amend its petition. The respondent mother first asserts that the court abused its discretion by allowing the amendment on the eve of trial. We find no abuse of discretion in this instance. The trial court complied with the appropriate Practice Book section[5] and offered to grant the respondents a continuance on at least two occasions to prepare to respond to the amendment. These offers were declined. Second, the respondent mother claims that the court erred in granting the amendment because the amended petition contained allegations relating to events that occurred after the filing of the original petition that are, therefore, only relevant to the dispositional, and not adjudicatory, phase of the hearing. She has failed, however, to refer us to any authority to support her claim that such a procedure is impermissible. The trial court, in response to this claim stated: "My practice has

---

[5] Practice Book § 1029 provides: "A petition may be amended at any time by the court on its own motion or in response to the motion of any interested party prior to the final adjudication of delinquency or neglect. When an amendment has been so ordered, a continuance shall be granted whenever the court finds that the new allegations in the petition, as amended, justify the need for additional time to permit the parties to respond adequately to the additional or changed facts and circumstances."

always been that when pleadings are stale, they should be updated so that the basis for the Court taking jurisdiction is not very ancient in time. Six months isn't always that ancient, but it is for a child six months' old. It seems to be extremely artificial to put our minds back . . . I don't think it does any hardships since I said that I would grant whatever continuance was necessary to enable you to prepare." We find no error in this reasoning.

In a sixth claim of error, the respondent mother claims that General Statutes § 46b-129, as applied by the trial court, is unconstitutionally vague and overly broad. She claims that the trial court's construction of the term "homeless," one of the two grounds set forth in General Statutes § 46b-120 for finding a child "uncared for," is so broad that an ordinary person would not be advised of what behavior is considered incompetent. We will not review this claim, however, because we have previously held that the trial court's finding that the child is "uncared for" is sustainable on the alternative ground set forth in General Statutes § 46b-120. An appellate court "will not pass upon a constitutional question if there is present some other ground upon which the case may be decided." *Hartford* v. *Powers,* 183 Conn. 76, 84–85, 438 A.2d 824 (1981).

In a seventh claim of error, the respondent mother claims that General Statutes § 46b-129 (c) violates the due process clauses of the United States and Connecticut constitutions. This statute provides in part: "The court after hearing on the petition and upon a finding that the physical or mental ability of a parent or guardian to care for the child or youth before the court is at issue may order a thorough physical or mental examination, or both, of the parent or guardian whose competency is in question." In the present case, the court, after a hearing, ordered the respondent mother to

undergo a psychological and psychiatric evaluation pursuant to this section. One of the doctors performing that evaluation later testified as to statements she made. Although the respondent mother claims that the statute violates procedural due process, she essentially argues that the statute violates her constitutional right against self incrimination by compelling her to make statements, albeit to a psychiatrist, that were introduced into evidence against her. See General Statutes § 46b-137 (b); Practice Book § 1046 (2).

In order to prevail on this claim, the respondent mother would, at a minimum, have to demonstrate (1) that the constitutional right against self-incrimination, a right in criminal prosecutions, extends as a matter of constitutional law to parents in juvenile proceedings, and (2) that if such a right exists, it would prohibit not only the compulsory testimony of a parent, but also the testimony of a doctor examining a parent. The respondent mother has cited no authority to support either of these propositions. Furthermore, there can be no question that the statute complies with procedural due process. "At their core, the due process clauses of the state and federal constitutions require that one subject to a significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard." *Council on Probate Judicial Conduct re: James H. Kinsella,* 193 Conn. 180, 207, 476 A.2d 1041 (1984). General Statutes § 46b-129 (c), by requiring the court to conduct a hearing before it may order the parent to undergo a mental examination, provides the necessary procedural protections to satisfy the state and federal due process clauses. We therefore find no merit to the respondent mother's claim that the statute violates due process.

Finally, the respondents contend that the court's disposition committing the child to DCYS for a period of eighteen months was not supported by a fair prepon-

derance of the evidence. This claim is wholly without merit. The facts and circumstances as revealed by the record and transcript fully support the court's disposition in this case.

There is no error.

In this opinion the other judges concurred.