[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF THE PROCEEDINGS:
This case concerns Gachalli A., whose date of birth is May 8, 1990, and who is the subject of coterminous petitions filed with the court by the Commissioner of the Department of Children and Youth CT Page 498 Services ("DCYS") on June 22, 1990. The petitions allege that the child is neglected and uncared for and seek to terminate the parental rights of her mother, Cindy A.[1], on the grounds of; (1) abandonment, (2) no ongoing parent child relationship, (3) acts of commission or omission. The petition also seeks a waiver of the one year requirement.
This child was voluntarily placed in foster care upon her discharge from the hospital on May 11, 1990. Initially it was hoped that the child could be placed DCYS with a maternal aunt in Pennsylvania; however, that plan did not work out.
On July 24, 1990 the court appointed both counsel and a guardian ad litem for mother who was committed psychiatric patient at the Norwich State Hospital. On July 26, 1990 an Order of Temporary Custody was issued by the court. The ten day mandatory hearing on the Order of Temporary Custody was waived by counsel and guardian of the respondent mother. The child has been in foster care since her discharge from the hospital at age three days.
An interstate home study was requested of the Maine authorities by DCYS during the summer of 1990 to determine whether the child could be placed with the maternal grandmother. The results of that study are addressed infra. On November 16, 1990 the court granted a motion filed by the maternal grandmother to intervene in the dispositional phase of the trial.
On November 29, 1990 a trial was held on the coterminous petitions. The respondent mother was present, as was her court appointed counsel and guardian ad litem. The intervening grandmother was not present, although she was represented at the trial by counsel. Testimony was received from Shirley Henry, a DCYS social worker; Dr. David Mantell, a clinical psychologist; and Marjorie Canfield, a psychiatric social worker form the Norwich State Hospital. No evidence was offered by the respondent nor the intervening grandmother.
FACTS:
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child, of which the court has taken judicial notice, permits the finding of the following facts:
Cindy A., the respondent mother, is a twenty-six year old woman who is suffering from chronic undifferentiated schizophrenia. She has been hospitalized at the Norwich State Hospital as the result of bizarre and/or violent behavior twelve times since 1984. Her most recent admission was on November 14, 1989. This hospitalization has continued through the date of trial of November 29, 1990. CT Page 499
Shortly after being admitted to the hospital in November, 1989 it was discovered that Cindy was pregnant. Continuous pre-natal care was provided to her through the efforts of the hospital. She gave birth at the William Backus Hospital by Cesarean Section on May 8, 1990 to a healthy, full term, 8 pound, 4 ounce daughter. (Exhibit #1).
While mother saw and held the child on at least two occasions while in the hospital, she has not seen the child since May 9, 1990. The child was discharged from the hospital and placed in foster care on May 11, 1990. She has remained in foster care ever since.
Mother has asked about the child but has not asked to see her. She has expressed no anxiety about being separated form the child or about the baby being permanently taken from her, DCYS attempted to set up visits between mother and child but mother's attending psychiatrists felt that it was not in the best interest of mother and might be dangerous to the child. They also felt it would interfere with mother's treatment. Consequently, because of mother's psychiatric condition, she has not seen Gachalli since the child was three days old.
Marjoire Canfield is a psychiatric social worker assigned as part of Cindy's Norwich Hospital treatment team. In addition to being a psychiatric social worker with ten years experience, and having worked with Cindy for more than one year, she is a mother herself. She was qualified by the court as an expert witness in her field of psychiatric social work. Majorie Canfield has known Cindy in her professional capacity since 1988 and is familiar with her psychiatric history. The court finds Ms. Canfield's testimony to be credible and persuasive.
Ms. Canfield testified that Cindy is suffering from chronic long term mental illness with a diagnosis of chronic undifferentiated schizophrenia. She has no knowledge of basic child care, she has no conception or understanding of the needs or limitations of an infant, and she has no conception of what she needs to do to develop parenting skills. Ms. Canfield attempted to discuss the issue and problems of childcare with mother but found that she was not interested in these matters. Mother's plans for the future do not involve the direct care of the child. She was only interested in what additional financial entitlements she would be receiving as the result of the birth of the child, and was content to allow others to provide care for Gachalli.
Ms. Canfield stated that not only is mother incapable of caring for her child, she is incapable of caring for herself without supervision. She expressed her opinion that it is unlikely that mother will be able to develop child rearing skills in the foreseeable future, nor will she be capable of playing a CT Page 500 meaningful role in the child's life in the foreseeable future.
Mother's current hospitalization has been punctuated with instances of violent and aggressive behavior. The hospital stall has been required to place Cindy in restraints on six occasions to control her violence.
Cindy's prognosis is poor due to a history of non-compliance with aftercare and lack of insight into her illness. As of date of trial, there are no current plans to discharge her from the Norwich State Hospital within the foreseeable future. Her physicians consider her to be a danger to herself and/or others. (Testimony of Ms. Canfield).
CLINICAL EVALUATION:
Dr. David Mantell, a licensed clinical psychologist, conducted a court ordered psychological evaluation of mother on October 3, 1990. Dr. Mantell, by agreement of the parties, was qualified by the court as an expert in his field of clinical psychology. The court finds Dr. Mantell's testimony and his report (Exhibit #2) to be credible and places great weight on his professional findings and opinions. "Psychological testimony is rightly accorded great weight in termination proceedings." In re Nicolina T., 9 Conn. App. 598,605 (1987).
Dr. Mantell reinforced and expanded upon Ms. Canfield's testimony concerning Cindy's diagnosis. According to Dr. Mantell's review of Cindy's medical files from Norwich Hospital, for which she waived her right to confidentiality, she has been diagnosed as suffering from: Organic Mental Disorder, cocaine delusional disorder: Cannibus Abuse: Alcohol abuse; History of Schizophrenia, undifferentiated and chronic, Dependent/Immature Personality Type.
Dr. Mantell stated that in his opinion there is no reasonable likelihood that mother will be able to provide adequate care for this child, regardless of the amount of support and services offered to her, in the foreseeable future. He indicated that it would be unfair, unrealistic and even cruel to attempt to reunite mother and child where there is no possibility of her playing a meaningful role in the child's life. Even under the best of conditions, circumstances, and treatment, it will be at least five years before mother might be in a position to care for Gachalli. Testimony of Dr. Mantell).
The following excerpts are reproduced from Dr. Mantell's report for emphasis. (Exhibit #2).
 Her Rorschach responses are clearly confabulated and those of a thought disordered person. They are consistent with the medical CT Page 501 diagnosis of schizophrenia as contained in her medical chart.
 Mother is chronically, mentally ill and additionally has an established pattern of antisocial behavior. . . . [She] is chronically impaired as a consequence of her mental illness which appears also to produce a consistent pattern of antisocial behavior. Her condition is inconsistent with parenting responsibility.
 The examiner considers it improbable that the mother will make a recovery sufficient for childcare. The examiner does not see a rehabilitative potential in the mother that might lead to the possibility of her caring for her child within the foreseeable future.
PROCEDURE TO BE FOLLOWED:
Where neglect and termination petitions are coterminously filed under section 17-43(e), the court is required to proceed in three separate stages.
First — Adjudication of the neglect/uncared for petition.
The court must determine, by a fair preponderance of evidence, if the child has been neglected or uncared for as of the date the petition was filed or was last amended. If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since both are based upon the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition will be deferred until a decision is rendered on the termination petition.
Second — Adjudication, termination petition.
If the court finds the child to have been neglected or uncared for it must next determine whether the evidence provides clear and convincing proof that any pleaded ground exits to terminate the parent's rights under section 45-61f(f). If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition. If grounds to terminate are found, it must move to the final stage.
Third — Disposition, both petitions.
If grounds are found to both adjudicate the child neglected or uncared for and to terminate the rights of the parents, the court must then consider whether the facts as of the date of disposition — the last date of hearing — support by clear and convincing proof, after consideration of the six factors enumerated in Section 45-61f(h), that such termination is in the child's best interest. If CT Page 502 the court does not find that the child's best interests would be served by terminating the parent's rights, it must return to and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order may issue terminating the parent's rights.
ADJUDICATION — NEGLECT PETITION — as of June 22, 1990.
While there is no evidence that the subject child has been neglected, the court finds from the weight and sufficiency of the evidence, taking into consideration the credibility of the witnesses, that the petitioner has proven by more than a fair preponderance of the evidence that Gachalli is an uncared for child.
In the instant case, mother is unable to care for herself much less her infant daughter. She does not have a physical home for Gachalli nor is she capable of providing the child with the care and nurturance required of an infant. Any normal infant has specialized needs, and the courts of this state have previously ruled that a mentally ill mother was unable to meet the special needs of an infant. In re Carl O., 10 Conn. App. 428 (1987). Consequently, the court adjudicates Gachalli A. to be an uncared for child in that mother is unable to provide the physical and emotional care that the child requires.
ACTS OF COMMISSION OR OMISSION:
In order to terminate mother's parental rights on the ground of acts of commission or omission under sections 17-43a(b) and 45-61f(f), the Court must clearly and convincingly find that the child was and, for will be denied the care, guidance or control necessary for her physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the parent.
The petitioner presents a strong argument for a finding of "predictive neglect" in the instant case and places great emphasis upon the well reasoned opinion of the court. (Brenneman, J.) in the matter of In re Jessica R. (Conn.Super.Ct. Juv. Matters, June 8, 1990). The logic and reasoning of that opinion are incorporated by reference into this memorandum of decision.
The court finds clear and convincing evidence that mother is not only currently unable to care for Gachalli, but she will continue to be unable to provide this child with even minimal care for the foreseeable future. The evidence is that mother will be released from the hospital within the near or foreseeable future. However, even if she were to be released into the community, placing the child with mother would result in a deprivation of the care guidance or control necessary for her physical, educational, moral or emotional well-being, given mother's lack of parenting skills and CT Page 503 history of failure to comply with phychiatric after care. (Testimony of Ms. Canfield).
Cindy A. has been hospitalized at the Norwich State Hospital for psychiatric reasons twelve times since August, 1984. While several of those hospitalizations were only for a few days, two periods of hospitalization in 1985-86 and in 1988 were for seven months each. Several other periods of commitment to the hospital were for two and three month periods. Her latest commitment to the Norwich State Hospital began in November, 1989 and has continued through and beyond the date the termination petition was filed. She is unaware of and unable to provide for even the most basic needs of this infant, and she will continue to be unavailable to provide care for this child for the foreseeable future. Dr. Mantell expressed his expert opinion that even under the best of circumstances mother will be unable to be a competent caretaker for Gachalli for at least five years. This evidence is credible and uncontradicted.
The public policy of this state is "to protect children whose health and welfare may be adversely affected through injury and neglect" and "to provide a temporary or permanent nurturing and safe environment for children when necessary" Conn. Gen. Stat. 17-38a. (Emphasis added). It would be absurd, and contrary to the policy of the State of Connecticut, to require an infant be placed in the custody of mother who clearly is, and will be, incapable of providing even basic care for the child, for the sole purpose of waiting for the child to suffer actual harm before placing the child in a permanent, nurturing adoptive home.
This mother is suffering from a chronic mental illness which has made her incapable of functioning as a safe and adequate parent. It is a condition which has existed for at least the past six years and is unlikely to change within the next five years. Gachalli must not be condemned to suffer years of uncertainty and lack of permanency because of this unfortunate circumstance. The court finds that to comply with the policy of this state concerning the protection and welfare of children it is necessary that this child be placed in a permanent nurturing and safe home.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines the ground of no ongoing parent-child relationship as the absence of an:
". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child[ren] and to allow further time for the establishment re-establishment of such parent-child relationship would be detrimental to the best interest of the CT Page 504 child[ren]."
The evidence is absolutely clear and convincing that here is no ongoing parent-child relationship in effect between mother and Gachalli, nor could there be. The coterminous petitions were filed only six weeks after the birth of the child. During those six weeks mother saw the child on two occasions, both of which were in the hospital shortly after the child's birth.
The issue then is whether to allow further time for the establishment of such parent-child relationship would be detrimental to the best interest of the child.
It is clear from the uncontraverted evidence produced both by Dr. Mantell and Ms. Canfield that mother is suffering from chronic mental disorder and that she will be unable to play a meaningful role in the life of Gachalli for the foreseeable future. The court finds clear and convincing evidence that the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of her child will not be generated between this mother and child within the foreseeable future. Mother, due to her chronic mental illness is receiving, and will continue to require, intensive psychiatric care for an indefinite period of time. The evidence is that there are no plans to discharge her from the Norwich State Hospital in the immediate or foreseeable future. It also clear that due to her mental condition, and the possible danger child, she is not being permitted by her psychiatrists to see or interact with Gachalli. Because of her mental illness and prior personal history it is most unlikely that she will ever be able to develop the parenting skills needed to care for this child or to develop a meaningful parent-child relationship with Gachalli with or without extensive support services. See: In re Juvenile Appeal (84-3),1 Conn. App. 463, 478 (1984).
The lack of a parent-child relationship and parenting bonding, as well as the uncertainty as to permanency for this child, is detrimental to Gachalli's best interest. Children need the certainty of a permanent, secure and nurturing home in which to grow and develop. Gachalli needs to bond with her permanent family at the earliest possible time in her life. That is especially important during for formative years. While Gachalli is yet an infant, she needs a loving, permanent adoptive home and family as soon as possible in order to foster her emotional development and maximize her potential. A child should not be forced to wait indefinitely to determine whether or not her mother will ever recover sufficiently to be capable of establishing a meaningful relationship with her or to play a useful role in her life.
The court finds clear and convincing evidence that, given CT Page 505 mother's chronic condition, to wait any longer to determine whether mother can or will be able to establish a meaningful relationship with this child would be detrimental to the well-being and not in the best interest of the child.
WAIVER OF THE ONE YEAR REQUIREMENT:
"[T]he court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." In re Christine F., 6 Conn. App. 360, 371 (1986). See: Conn. Gen. Stat. 17-43a(c) and 45-61f(g).
The evidence is clear that mother is unable to care for herself much less care for an infant child, and that this condition has existed for at least the eight months during which mother has been institutionalized prior to the filing of the coterminous petitions. The evidence is also clear and convincing that this condition is not likely to change within the foreseeable future.
Waiting for the statutory one year to pass is not going to alter the outcome of this situation. However, establishing permanency for this child at as early an age as possible is a compelling reason not to delay the inevitable termination of mother's parental rights. Consequently, the court clearly and convincingly finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child.
DISPOSITION — as of November 29, 1990:
Counsel for the respondent mother argues that her parental rights should not be terminated in this case because Article 1, Section 20
of the Connecticut Constitution provides that "no person shall be denied the equal protection of the law, nor be subjected to segregation, or discrimination . . . because of . . . mental disability."
"Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." In re Nicolina T., 9 Conn. App. 598, 605 (1987), citing In re Theresa S. 196, Conn. 18, 29-30 (1985).
In the instant case, mother's parental rights are not subject to termination because she is mentally disabled, rather it is because her mental illness has rendered her incapable of providing Gachalli with the care, love, and parent-child interaction necessary to the child's physical and emotional development and well-being. To that end, mother is not the subject of discrimination or denial of equal CT Page 506 protection of the law as the result of her mental disability. She is being treated as any other individual who is unable to care for her child. In re Nicolina T., supra Consequently, the respondent's challenge on constitutional grounds is unavailing.
DISPOSITION — as of November 29, 1990:
The court, having adjudicated this child as being uncared for, and having further found proven by clear and convincing evidence two statutory grounds for terminating mother's parental rights, makes the following six mandatory findings pursuant to In Re Shavoughn K.13 Conn. App. 91, 98, (1987), and sections 17-43a(d) and 45-61f(h) of the General Statutes:
 (1) Efforts by DCYS to facilitate visits between mother and child but were attempted but unsuccessful as such visits were deemed to be contraindicated by mother's psychiatrists. DCYS was unable to provide mother with any additional services due to her institutionalization. It would be meaningless to attempt to set up or offer additional services to a mother who is, as in this case, incapable of utilizing them.
 (2) Mother complied with the court order psychological evaluation. There were no other court orders entered in this matter.
 (3) There is no ongoing parent-child relationship between mother and Gachalli. Mother has not seen the child since she was three days old. There are no emotional ties between mother and child.
 (4) The child's date of birth is May 8, 1990. She is, at age seven months, very adoptable.
 (5) Mother has been and continues to be unable to adjust her conduct, circumstances or conditions to made it in the child's best interest to be returned to her in the foreseeable future. Because of mother's mental illness and long term hospitalization, there has been no contact between mother and child. DCYS has maintained contact with mother and her medical caregivers.
 (6) No one has unreasonable or illegally prevented mother from establishing a meaningful relationship with her child. Economic considerations are not a factor in this case.
INTERVENING GRANDMOTHER:
It is the finding of the court, after reviewing all of the evidence, including Dr. Mantell's Psychological Report of November 21, 1990 (Exhibit #3), and the material contained in Exhibit #5, including the Maine home study report, that it is not in the child's CT Page 507 best interest to be placed with the intervening maternal grandmother. Both the Maine report and that of Dr. Mantell recommend against such placement and the court has no credible evidence to refute those findings and recommendations.
JUDGEMENT
Having considered the foregoing, it is found by clear and convincing evidence to be in the best interest of Gachalli for her mother's parental rights to be terminated so that she may be raised in a permanent, secure and nurturing environment as an adopted child.
It is therefore ORDERED that the parental rights of Cindy A., in and to Gachalli A., are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgment a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
Dated at Montville this 4th day of January, 1991.
Terence Sullivan, Judge