MEMORANDUM OF DECISION
Donnell Timothy W. was born July 1, 1991. The mother of the child is Gina M. G., d/o/b January 25, 1963; the father is Donnell W., d/o/b March 26, 1953.[2] The child has been in foster care since July 5, 1991 when, upon discharge from the hospital, an OTC was obtained and co-terminus petitions were filed by the Department of Children and Youth Services (DCYS). The matter is currently before the court on the uncared for petition;[3] the amended petition alleges that the child is uncared for in that he was homeless, and, that since the child had specialized needs, his home could not provide the specialized care which his physical, emotional or mental condition required. CT Page 2281
Notice and Jurisdiction
The return of service annexed to the uncared for petition certifies in hand service on respondent/mother. Documentation in the official court file confirms notice by certified mail to respondent/father at a specified out-of-state mailing address.[4]
It is hereby found that the service and notice were effected in accordance with the requirements of law. This court has jurisdiction to hear and adjudicate the instant petition, as amended. General Statutes Section 46b-129.
Standard of Proof
A fair preponderance of the evidence standard of proof is the proper standard in neglect/uncared for proceedings. In re Juvenile Appeal (84-AB), 192 Conn. 254, 266 (1984).
Adjudication
(a) Uncared For: Homeless.
This petition was filed July 5, 1991, and amended on September 27, 1991. Prior to the child's birth, respondent/mother, in February 1991, received a seven month sentence for violation of probation; she was discharged from Niantic on July 16, 1991, a few weeks after Donnell Timothy W. was born, and the filing of the co-terminus petitions. Shortly after her release (and following a visitation with the child), it appears that she left Connecticut and visited the respondent/father. Prior to her release form Niantic, the mother was evaluated by Dr. Sadler (on May 10, 1991);[5] the evaluator, after reviewing thoroughly the records of a prior Norwich State Hospital admission, and following the evaluation, described respondent/mother as "a seriously emotionally disturbed woman who demonstrates ongoing psychotic functioning as evidenced by responding to hallucinated voices, disorganization of thinking, variations in mood and impulse control, and violently aggressive and disorganized behavior." Noting that the mother had historically resisted recommended therapy except when in inpatient settings, the psychiatrist observed that she had "not followed through with any treatment efforts when left to her own resources," and, had failed "to address either her drug abuse or her psychiatric impairments." Dr. Sadler expressed the opinion that substance abuse had been CT Page 2282 and remained a serious problem for Gina M. G., and that the mother suffered from an "ongoing emotional disorder of psychotic proportions;" he concluded that respondent/mother required "intensive long term and highly structured psychiatric treatment in addition to an intensive drug rehabilitation program."[6]
Following her release from Niantic, and her return to Connecticut in early August 1991, respondent/mother began visitation with this child at the DCYS office.[7] Generally, she visited roughly one hour each week; during the visits, the supervising worker observed bizarre conduct and incoherent strange verbalizations by the mother.[8] Respondent/mother was referred to Capitol Region Mental Health and was also referred for substance abuse treatment and counselling.
Prior to her arrest on the VOP, respondent/mother was staying with her cousin Mary T.[9] At some point in August 1991, respondent/mother apparently moved into the home of her aunt, Edith W., where she states she has resided to date.[10] Mother testified that Ms. W.'s home has three bedrooms, one of which she uses as her own. According to the evidence, the child's maternal great grandmother, Lena C., also resides in the home and is wheelchair bound.[11]
The evidence indicates that respondent/father is an educated, gainfully employed person; he initially (on or about 5/28/91) expressed doubt that Gina M. G.'s expected child was his; however, on July 7, 1991, he contacted the social worker from his out-of-state residence and stated that the newborn was his child. The worker testified that the father visited Donnell Timothy W. in September 1991; according to the social worker, the father expressed no specific plan for the child, although an interstate home study was discussed, primarily with regard to Donnell Timothy's older brother, Isaac D. W.[12]
At the time of the filing of the instant petition, respondent/mother was incarcerated at Niantic. In the court's view, even extending the operative adjudicatory date from July 5, 1991 (date of filing) to September 27, 1991, when the petition was amended to add respondent/father as a party, the credible evidence fairly established that neither the mother, given her history of unstable living arrangements and severe psychiatric and substance abuse problems, nor the father, in view of his not having presented a viable plan for this child, was in any position to provide a home where the care requirements of the CT Page 2283 newborn infant could be met in an adequate, competent manner. Accordingly, it is hereby found, applying a fair preponderance of the evidence standard, that Donnell Timothy W. was an uncared for child within the intent and meaning of the laws of the State of Connecticut (General Statutes Section 46b-120) in that he was homeless; and said child is so adjudicated.
 (b) Uncared For: Specialized Care Which Could Not Be Provided In The Home.
Donnell Timothy W. weighed seven pounds, fourteen ounces at birth and was, and continues to be, a healthy child. It is recognized that "`[a]ll babies have special needs that are not shared by older children capable of meeting their own needs,'" and, that "`[b]abies are totally dependent upon adult caretakers for every detail of their existence, and a parent capable of caring adequately for a ten year old, or even a five year old, might not be capable of caring for an infant.'" In re Carl O.,10 Conn. App. 428, 435, fn. 3 (1987). It is clear that on July 5, 1991 (date of filing), and on September 27, 1991 (date of amendment), respondent/mother, for the reasons stated in the preceding section hereof, was incapable of adequately caring for a normal, newborn infant; and, as also stated aforesaid, respondent/father had offered no specific plan for the child. Nevertheless, it is not felt that as to this alleged uncared for ground, petitioner has proved, by a fair preponderance of the evidence, any specialized needs of Donnell Timothy W.; that is, any special physical or psychological needs beyond the very demanding care needs of a normal newborn child. While certain documentation admitted into evidence speaks to more recent, occasional "temper outbursts", and some "lagging behind" with respect to verbal abilities, there is no indication that this child, at birth, and in the months following, was anything other than a perfectly healthy, normal newborn infant.
Petitioner asserts the applicability of Carl O., and contends that the case establishes specialized needs solely on the basis of infancy and its consequential, exceedingly difficult care demands. However, in the Carl O. decision, the Appellate Court stated:
 "the respondent father claims that the trial court erroneously concluded that the child had `special needs' merely because he was an infant. This claim misconstrues the trial CT Page 2284 court's memorandum of decision. The trial court found that the child required specialized care both because of his infancy and his particularly sensitive nature." (Emphasis added).
10 Conn. App. supra at p. 435.
The Appellate Court then footnoted the trial judge's finding relating to the child's "particularly sensitive nature":
 "In addition, Carl at less than five months of age, was an extraordinarily sensitive baby, needing more than the usual degree of appropriate responsiveness from his adult caretaker. (Emphasis added).
10 Conn. App. supra at p. 435, fn. 3.
In Carl O., there was present something in addition to just the child's infancy, albeit, not a great deal (at least to the extent apparent from the appellate decision); in the instant case, that additional component of the child's condition at and/or following birth, which would characterize the baby as other than a perfectly normal infant, is not, in the court's view, present from the evidence developed at trial.
It is concluded that petitioner has not established, by a fair preponderance of the evidence, that Donnell Timothy W. was uncared for on the basis of specialized needs which could not be met in the home, and that ground may be, and hereby is, dismissed.
Disposition
Respondent/mother was discharged from Cedarcrest in late March 1992; follow-up therapy at Capitol Region Mental Health involved monthly injections of haldol deconoate. The mother cooperated and complied with respect to receiving the required medication injections; in January 1993, it was reported that the haldol deconoate had been discontinued on the advise of the obstetrics clinic, St. Francis Medical Center. Respondent/mother has visited on a regular basis with Donnell Timothy W., and with her other children. The initial diagnosis at Capitol Region was that mother suffered from chronic paranoid CT Page 2285 schizophrenia; it was felt that compliance with medication, cooperation in therapy, preparation for independent living, and the putting in place of a parenting skills program were all imperative. Even with the aforesaid, a prognosis with respect to her future parenting capacity was uncertain.
In a September 1992 re-evaluation of the respondent/mother, Dr. Sadler observed that she appeared "more sedate and settled in her presentation," and although her "judgment and ability to think in an organized manner appeared to be quite similarly impaired," the mother was "somewhat improved when compared to her May 1991 evaluation." The psychiatrist stated: "Ms. G. . . . was not so diffusely or flamboyantly disorganized and thought disordered as before . . . [she] appears to have responded to her course of medication and her psychiatric treatment, yet she does not have enough insight to appreciate her need for treatment and to understand its usefulness to her." Dr. Sadler concluded that respondent/mother was "functioning without an overt affective disorder, but with a residual thought disorder that indicates a residual psychotic disorder which has only partially responded to her medication;" he stated: ". . . the residual effects of a Schizophrenic Disorder continue to be seen." The psychiatrist, in late 1992, felt that the mother continued to function in "a seriously impaired" and "residually psychotic" fashion; when asked to elaborate on his use of the term "residually psychotic," the evaluator testified that respondent was "overtly psychotic in the past," but "much improved" in September 1992, although she simply could not acknowledge her past psychotic behavior, condition, and conduct.
In October 1992, the social worker testified that the situation had improved, the child was far more accepting of his mother during the supervised visitations, and that Donnell enjoyed the company of his brothers during visitation.[13] In September 1992, the mother had again encountered difficulties with the criminal justice system, having been arrested on prostitution charges; the incident apparently involved an arrest at a street location some distance from her aunt's home at approximately 1:12 A.M. As a result of the aforesaid, respondent/mother served a short sentence at Niantic. It is reported (documents in evidence) that further difficulties developed in December 1992 regarding a minor larceny arrest and, thereafter, the issuance of a failure to appear warrant. Visitation with all of the children was somewhat sporadic in late 1992 and into early January 1993; on or about January 2, CT Page 2286 1992, respondent/mother contacted DCYS' Regional Office informing the worker that she had been Florida from mid-December and had just returned.
Respondent/mother testified (on 1/28/93) that she is continuing with the out-patient therapy at Capitol Region, that she continues to reside at her aunt's apartment where she has her own bedroom, and that she still wishes to care for her son. The mother testified she contemplates eventually returning to Florida "to live with her fiancee" and that, in many respects, she considers Florida her home. Gina M. W. stated that she receives public assistance in the amount of $300 per month, pays $250 per month rent, and utilizes the remaining $50 for food, clothing, etc. Respondent feels that she is capable of caring for Donnell Timothy W., that her aunt's apartment is adequate, and that, in time, she wishes to have her own home and all of her children with her.[14]
Respondent/father continues to reside out-of-state, has not recently inquired of DCYS regarding this child, and it is reported that he has not contributed to the support of the children other than an income tax refund intercept in 1991. With respect to respondent/father's out-of-state residence, the evidence was not clear regarding any follow-up, either by him or by DCYS, on the interstate home study.
Donnell Timothy W. remains in foster care; medically and developmentally the child is fine, although recent concerns have been expressed regarding obesity and speech delay.
On the totality of the credible evidence, and after carefully reviewing all of the relevant material, the court finds, applying a fair preponderance of the evidence standard, the following: (1) that reasonable efforts have been made by the state agency to undertake to have the child returned to the mother's care; and, (2) that, at this point in time, commitment of the child to DCYS is consistent with the child's best interests.
The said child, Donnell Timothy W., having been adjudicated an uncared for child, is hereby Ordered committed to the Commissioner of the Department of Children and Youth Services for a period not to exceed eighteen months. The Commissioner shall file timely and appropriate treatment plans. CT Page 2287
The court hereby establishes the following expectations with regard to respondent/mother: (1) cooperate with DCYS and keep the agency fully informed of whereabouts; (2) no drug/alcohol abuse; (3) participate in any requested substance abuse assessments, and recommended follow-up counselling; (4) continue to participate and cooperate in mental health therapy and counselling; (5) visit regularly with the child; (6) maintain adequate housing and income; (7) participate in any individual and/or family counselling as recommended by DCYS; and, (8) avoid further involvement with the criminal justice system. The court hereby establishes the following expectations with regard to respondent/father: (1) fully cooperate in any interstate home study requested and conducted with respect to his out-of-state residence; (2) cooperate with DCYS; and, (3) maintain contact with, and interest in, the child.
This child has been in continual foster care virtually his entire life. Every effort should be made to work toward a timely reunification, if such can be accomplished in a manner that is entirely consistent with the best interests of this child. It is the agency's responsibility to work diligently toward a goal of eventual reunification.
Compliance with all of the aforesaid is to be monitored by a CIP representative.