Memorandum of Decision
This case presents a petition by the Commissioner of the Department of Children and Families ("DCF") for the termination of the parental rights of Gina M. G., the female biological parent of the above listed children and Donnell W., the male biological parent of the three older children. The male biological parent of the youngest child, Ultara, is one Ray D. a 34 year old Hartford area drifter who has taken no interest in the child and refuses to cooperate with the child protection workers. The children are Isaac, a male child born on March 22, 1988, Donnell, a male child born on July 1, 1991; Janie Marie, a female child born on May 11, 1993 and Ultara, a female child born on April 11, 1995.
The Social Study for Termination of Parental Rights (Petitioner's Exhibit #7) alleges that Isaac was adjudicated as Uncared for on September 30, 1991, based upon a petition filed on February 15, 1991.
On July 5, 1991, four days after his birth, coterminous petitions alleging Donnell to be uncared for were filed by DCF. The petitions alleged that he was homeless and had needs that could not be met in the home. Donnell was committed to the Commissioner on March 3, 1993 as an uncared for child.
On May 13, 1993, two days after the birth of Janie Marie, a CT Page 11341 petition was filed by DCF alleging that the child had been neglected in that the child had been denied proper care and attention, physically, educationally, emotionally or morally and was permitted to live under conditions, circumstances or associations injurious to her well being. This petition was dismissed by the court (Foley, J.). In the Memorandum of Decision filed on November 9, 1993, the court stated:
 Daniel Huntley, a social worker for the Department of Children and Families indicated in his testimony that mother admitted taking cocaine on Mother's Day which was the day or two before the child (Janie Marie) was born.
 As indicated earlier, the child was born on May 11, 1993 at Mt. Sinai Hospital in Hartford. The medical records placed in evidence indicate that there was poor personal hygiene of the mother; that she was sleepy most of the day and uncompliant with suggestions for personal hygiene. — Hospital records indicate that mother admitted using cocaine three days prior to delivery. Both her urine toxicology and that of the baby were positive for cocaine. Gina indicated to the hospital staff that she had no clothing for the baby nor any equipment for the baby. Gina declined drug and alcohol abuse counseling both during her pregnancy and during her hospitalization. Nurse Caplin of Mt. Sinai Hospital indicated that mother was unresponsive to the newborn's cries and that she was difficult to rouse. Based upon the foregoing information the Department of Children and Families sought and obtained an Order of Temporary Custody. This child has never been in the exclusive care and custody of her biological mother. . . . It is therefore concluded that the petitioner has not established by a fair preponderance of the evidence that Janie Marie. was "neglected" since she had never been in the exclusive custody of the respondent mother. Accordingly, the petition must be dismissed.
 In re Janie Marie W. Hartford-New Britain SCJM DN N-93-325
As a consequence to the social worker not fully appreciating the legal distinctions between a neglected child and an uncared CT Page 11342 for child, as set forth in the cases of In Re Carl O.,10 Conn. App. 428, 435-36 and In Re Kelly S., 29 Conn. App. 600, 613
(reversed on other grounds), the petition was dismissed and DCF was required to bring a new petition alleging the more appropriate, and only relevant, ground of uncared for child. An adjudication on that ground occurred on March 3, 1994.(Foley, J.)[2]
With respect to Gina's fourth child, Ultara, a petition alleging neglect and uncared for was filed by DCF on May 26, 1995. On January 16, 1996 Ultara was committed to the Commissioner as a neglected and uncared for child due to the failure of both parents to provide a home and due to Ultara's significant developmental delays. At the time this petition was filed to terminate the parents rights, Gina was incarcerated, as she has frequently been through the years.
The Female Biological Parent:
Gina was born in January, 1963. "Her mother died after being struck on the head with a hammer when Gina was a year old." (Social Study). Gina has a ninth grade education. She had a son by one paternity at age 17. She later met Donnell W., a Hartford police officer and her landlord, by whom Gina had the three children Isaac, Donnell, and Janie Marie. It would be sad to recall and catalogue the numerous problems of Gina and the hospitals at which Gina has been seen for her mental and substance abuse problems. These problems have resulted in frequent involvement with the criminal justice system. (Reference is made to pages 2 and 3 of Exhibit #8). Her situation and conduct may best be described as recounted in a prior decision in her neglect case:
 Carol Champ, a nurse clinician at the Capitol Region Mental Health Center indicated that she has been seeing Gina for the last year and a half or two years. Ms. Champs indicated that this woman required weekly psychiatric therapy although she was not regularly receiving it. It was her analysis that Gina had regressed in her treatment and that she would be unable to provide proper care for an infant.
 During the trial, Gina was present. Both Dr. Pinter and Nurse Champs were asked by mother's CT Page 11343 counsel to describe the mother's condition and appearance in court. Both Dr. Pinter and Nurse Champs indicated that Gina was not doing well today. She had poor grooming, poor hygiene, she was lethargic and Nurse Champs indicated that she "suspects her of abusing drugs today". In re Janie Marie W. Hartford-New Britain SCJM DN N-93-325 (November 9, 1993) p. 3
A review of the case record for each of the children reveals that Gina has not made any substantial improvement in her ability to care for herself in the six years that these cases have been within the juvenile court system. She is unable to care for these children or provide a home for them. According to Dr. Sadler, Gina is seriously impaired with a thought disorder and massively impaired judgment. He testified to erratic behaviors, at times lucid, with periods of substance abuse and psychotic behavior with delusions. Her behaviors make it impossible for her to parent a child, "just to be physically present, let alone parent her children. Her behavior is sufficiently bizarre that at times she is unable to care for herself"
The Male Biological Parent of Ultara:
Ray D. is the father of Ultara. He is a 34 year old recipient of general assistance in Hartford. Gina has told him that the DCF social worker wants to talk to him to get some background information. They have been unable to meet with him. He has never cared for the child, inquired about her well being, visited her, sent her gifts, or manifested the slightest concern or responsibility toward the child.
The Enigma: The Male Biological Parent of Isaac, Donnell andJanie Marie.
Donnell W., the father of the three older children is 44 years old. He was born in South Carolina. He was raised by his father and an aunt. He has a double Bachelor's Degree in Urban Studies and Criminal Justice, which he received in 1978, according to his testimony. That same year he married. He has four children by that marriage. He was working on a post-graduate degree in Public Administration. He worked as a police officer in Council Bluffs, Iowa and then moved to Connecticut in about 1980. He obtained a position as a police officer in the city of Hartford where he worked for 10 years, until March of 1990 when CT Page 11344 he left to return to the south. He testified he always wanted to go back to the south to raise his family and a friend of his was the head sheriff in Avondale County where he was born. He was employed in Florida as a supervisor in a warehouse and was a co-founder of the Lackawana Youth and Family Association.
He testified that while he now desperately wants custody of his children, when he left for Florida he did not want custody of Isaac. After Gina got arrested in 1991, he told the DCF worker, Mr Huntley, that Isaac had not been living with him and that the child should be raised by his mother. Mr. W. had not been raised by his mother, who had been murdered when he was 3 months of age[3], and he wanted Isaac raised by his mother following her release from the Norwich State Hospital.
He testified that in his first two years in Florida, he came back to Connecticut about four times a year. When he came back he had difficulty in seeing his kids and, in 1993, he got frustrated and, apparently stopped trying. The social worker told Mr. W. that he should provide more notice of his intention to come to Connecticut so that visitation could be arranged. Following his departure from Connecticut, Gina had pregnancies by Mr. W. for Donnell and Janie Marie.
 Dr Richard Sadler, a court appointed psychiatrist reported that:
 [Mr. W.][4] was described as visiting his children irregularly and providing short notice for requests to visit his son. In 1992, [Mr. W.] was known to be in Hartford without requesting to visit his son Donnell. In 1993, [Mr. W.] sent a letter to DCF to document his intention and his desire to care for his children. [Mr. W.], four months later, failed a meeting with his children. In January of 1994 [Mr. W.] attended a DCF administrative review, although he abruptly left before visits could be arranged with his children. [Mr. W.] visited six months later, on July 10th and 11th. (Petitioner's Exhibit # 1 p. 3)
The court (Foley, J.) ordered an in-home investigation of Mr. W.'s home in Florida in 1993 to determine whether Mr. W. had a suitable home for the children. It was explained to the court at the time that these "interstate compact studies" would take quite a long time to complete. They did. A report dated August 15, 1995 CT Page 11345 was done by the State of Florida Department of Health and Rehabilitative Services, finding that the department "can not recommend out of state visitation." The court concludes that the report was shallow and misleading. The female investigator told Mr. W. that his home needed "a women's touch." They also told him to take a cooking class, a parenting class and a course in child development. Mr W. testified that he did take classes in those areas and offered a certificate to establish taking an "Overview of Parenting" class.
In August of 1990, Gina and her oldest child and Isaac, went to Florida where they lived with Mr. W. until November, 1990, at which time they returned to Connecticut. Isaac was three years of age. They had remained there for little more than three months. That was the only time any of these children had an opportunity to form a relationship with Mr. W. and that was for Isaac only, seven years ago.
Dr Sadler found Mr. W. to be a challenging evaluation. He found him to show no disturbance of mood or of his reasoning ability; he functioned in an intellectually average manner. Dr. Sadler said that Mr. W. would like to be connected to his children, that he was a personally rather appealing man, emotionally and intellectually, but he could not provide anadequate explanation about why he had not cared for his children.(Emphasis added). He was able to inter-act, he was general adequate, but he did not care for the children or visit or make himself available for the children. He appeared able to do so, but he simply has not done it. "The explanation that he will now care for his children seems sufficiently improbable based upon his history. His protestations of commitment to his children and of his vigorous efforts to provide for his children and regarding his efforts to establish himself as a parent over the past eight to nine years, appeared to have little substance."
Mr. W. testified in court that he has returned to Connecticut as of December, 1996, to gain custody of his children. He provided the court with letters of recommendation indicating him to have been a "father-figure" to youth in Florida, that the children ". . . couldn't have a better parental figure that would mold them into fine mature citizens of their community, no matter where they live." (Exhibit E.)
There was no testimony or exhibit offered to explain the seeming contradictions of his enormous energy and ability to CT Page 11346 parent vs. his failure to do so. The male biological parent of these children seems to fit a model parental role. He appears to be an interested, college educated, former police officer, a community youth worker with no discernible mental health problems, and virtually continuously, well-employed. This picture was an enigma for the social workers, the attorneys and the psychiatrist. Something was wrong with this picture.[5]
After three days of testimony the answer to this puzzle emerged at quarter to five in the afternoon on the last day of trial. Why had he left an excellent position with the Hartford police department? He told the investigator in Florida "he chose to leave because he got to (sic) comfortable with the job." Why had he not obtained the position with his friend who "was now the head sheriff in Avondale county"? Why had he not obtained a position in criminal justice for which he was suited and trained? Why was he working at various jobs such as in a hardware store or as a warehouse supervisor? Why, as the Florida study noted, did he buy his house in Florida ". . . for his brother then his brother gave him the house back." Why would he come to Connecticut unannounced, never giving the social worker or the foster parents advanced notice of his intentions to visit? Why was this, virtually model parent, not parenting? At the conclusion of the trial the court asked Mr. W. two questions: when had he been divorced and later, how much he might have been required to pay for alimony and child support for his four children by his first marriage. Mr. W. indicated he was divorced in February, 1990, and that he would have had to pay $600-700 per week. He left Connecticut one month later.
The court concludes that it is quite likely that Mr. W. left Connecticut to avoid a wage withholding order on his pay as a Hartford police officer. As a "dead-beat dad" he was unable to obtain work as a police officer or any other high visibility job where he could be located or where a background investigation might reveal his past and permit his wages to be attached. This would explain his precipitous departure from Connecticut, his unwillingness to announce in advance his intentions to return to Connecticut, the status of his property in Florida and, after the emancipation of two of his older children from the first marriage, his return to Connecticut.[6]
Whether this scenario accounts for Mr. W.'s conduct or not, it is clear that he was not physically available for these children. He has failed to establish a relationship with the children. Were it not for his blustery well-wishes and CT Page 11347 pronouncement of good intentions to raise and care for them at the parent-child interaction session conducted at Dr. Sadler's office on April 23, 1997, these children would not be able to recognize this man, let alone know that he was their male biological parent. It is equally clear that the children wish to remain where they are presently being cared for, nurtured and supported in their present foster placement. The children have no wish to be parented by this man. Given Mr. W.'s many positive attributes, this is truly regrettable. His magnanimous gestures and overtures come too late.
Adjudication
With respect to the statutory grounds for termination of parental rights of the father, the court finds by clear and convincing evidence that with respect to Mr. Ray D., the male biological parent of Ultara, he has failed to support the child or manifest any parental interest, whatsoever, and has abandoned them as that term is defined in General Statutes §17a-112(c)(3)(A).
With respect to the statutory grounds for termination of parental rights of the mother, Gina M.G., the court finds by clear and convincing evidence that the children have previously been adjudicated neglected and/or uncared for and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. General Statutes § 17a-112(c)(3)(B).
With respect to the statutory grounds for termination of parental rights of Mr. Donnell W., the court finds by clear and convincing evidence that the male biological parent of Isaac, Donnell and Janie Marie has no ongoing parent-child relationship, with these three children, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the children and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the children; General Statutes § 17a-112(c)(3)(D).
The court finds that these grounds have existed for more than one year. CT Page 11348
Required Findings:
The court makes the following factual findings required by17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families, including counseling, pharmacological assistance, day treatment programs, substance abuse treatment and visitation coordination for mother. Ray D. was not available for the delivery of services and Donnell W. did not require services. He was a person who was at all times capable of caring for his children. He did not do so.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father Ray D. was unable or unwilling to benefit from reunification efforts. The father Donnell W. was tragically unavailable for reunification services. Mother's inability or unwillingness to address her multitude of personal problems, has prevented successful reunification efforts.
3) The Department, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. There was only marginal compliance or participation by the mother. Neither father made themselves available to participate in reunification efforts.
4) The children have strong emotional ties with the foster families who have provided the physical, emotional and educational support these children need. The children have little or no positive emotional ties to the biological fathers. The children have only a visiting relationship with mother, not a parental relationship.
5) Finding regarding the age of the children. Isaac, Donnell, Janie Marie and Ultara are 9, 6, 4 and 2 respectively. These children require stability of placement and continuity of care. Except for Isaac, they have been committed to the Commissioner for their entire existence.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The parents have not CT Page 11349 made realistic and sustained efforts to conform their conduct to acceptable parental standards. Mother requires extensive therapy to deal with her parental failings, substance abuse and personal psychiatric difficulties. Ray D. Made no efforts. While Mr. Donnell W. has been able to parent and is not in need of "rehabilitation," his failure to maintain a relationship with his children has displaced him as a possible parental figure. He has made choices in life that have precluded him from parenting. Giving him additional time to establish a relationship where none now exists, would not be in the children's best interest In reLuis C. 210 Conn. 157 (1989); In re Juvenile Appeal 183 Conn. 11,15.(1981).
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. The substance abuse and criminal behavior of the mother has resulted in his recent arrest and incarceration. Both fathers have elected to remain in the periphery of these childrens lives. The Department initially attempted to encourage contact and involvement by Mr. W., but his unexplained conduct and erratic behavior, discouraged the department from a more vigorous pursuit of him as a placement resource. No unreasonable conduct is noted. The mother has had visitation with the children.
DISPOSITION
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the children's best interest to terminate the parental rights of Gina M.G., Donnell W., and Ray D. This finding is made after considering the children's sense of time, their need for a secure and permanent environment, the relationship that the children have with their foster parents, and the totality of circumstances that the termination of parental rights is in the children's best interest. In reJuvenile Appeal (Anonymous), supra, 177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the BestInterests of the Child (1979).
Based upon the foregoing findings, it is accordingly, ORDERED that the parental rights are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within 90 days. A review Plan for Terminated Child shall be filed in CT Page 11350 accordance with Federal Law.
Francis J. Foley, Presiding Judge Child Protection Session