[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
When 13 days old, Kristopher M. became the subject of petitions coterminously filed by the Department of Children and Youth Services (DCYS) pursuant to subsection (e) of 17a-112 of the Conn. Gen. Statutes (Rev. 1991) which allege him to be neglected and uncared for as a result of the circumstances attendant at his birth on February 7, 1991, and at the same time seek to terminate the parental rights of Arline M., his mother and, lacking an adjudicated or acknowledged father, sole legal guardian on the ground that those circumstances constitute a denial by acts of parental commission or omission of the "care, guidance and control necessary for his. wellbeing".
An additional ground pleaded for terminating the mother's CT Page 1642 parental rights is the absence of a parent-child relationship and the detriment to this child's best interests if the time ordinarily required to establish such relationship is permitted to pass because of his mother's longstanding history of polydrug abuse, violence, arrests and incarcerations.
The respondent mother was personally served with both petitions but, despite the offer of transportation, failed to appear at the initial hearing on February 27, 1991 when the Order of Temporary Custody (OTC), previously secured ex parte by DCYS pursuant to subsection (b) of 46b-129, was confirmed without prejudice. Despite her failure to apply for the appointment of counsel after being advised to do so by the intake social worker, the court, suo moto, appointed such counsel to represent her in this matter.
At a pretrial conference on March 25, 1991, counsel for Arline announced her intention of securing an independent psychiatric evaluation of her client which could be used or not in her discretion at the time of trial. Such motion was duly filed and granted ex parte two days thereafter. At the same conference, DCYS considered moving for a court-ordered examination to be made available to the court regardless of which party was favored, out did not do so prior to trial.
On the first trial day, however, on May 8, 1991 the petitioner's motion for a court-ordered psychiatric examination of the mother's potential for adequate care taking of this child was joined by the child's attorney/guardian ad litem and granted by the court. At the same time the petitioner's motion to amend the pleadings by adding the ground of abandonment to both petitions was granted.
At the second trial day, May 29, 1991, the mother who had not pursued the motion granted March 27, 1991, again moved for funds for an independent clinical evaluation. Her motion was again granted and that evaluation secured on June 24, 1991. On June 19, 1991 her motion to strike the testimony of her quondam drug counsellors was denied, the court determining, after briefing and argument, that Federal law (42 U.S.C. § 290ee-3) permitted disclosure of substance abuse treatment records upon court order for good cause shown. 24 C.F.R. 2-63, 2-64. Further testimony was offered by both petitioner and respondent on July 24, 1991 and concluded October 24, 1991, at which time decision was reserved, the parties electing not to file further trial memoranda.
Facts
Evidence offered on diverse trial days between February CT Page 1643 27, 1991 and October 24, 1991 supports the finding of the following facts:
Arline M., sexually and physically abused by an alcoholic father and unprotected by her mother, was estranged from both parents and all of her four siblings at the time of Kristopher's birth on February 7, 1991.
Her first out-of-wedlock child, a daughter born in 1985, had two years earlier been placed in the guardianship of a maternal aunt after Arline, homeless after alleging sexual abuse of her daughter by her father, caused her to leave her parents' home. Although the recipient of a high school diploma from an alternative program for disturbed children, her psychiatric and substance abuse problems had always precluded sustained employment and at the time of Kristopher's birth she was a recipient of Supplementary Social Security for the disabled report of probation officer Shea.) For five months during her pregnancy with Kristopher (July — December, 1990), Arline was incarcerated at Niantic prison after injuring her male roommate with a knife — her 13th arrest in less than three years. (State's Exhibit H, fourth page.) After her release on December 14, 1991, she resumed using drugs and entered a sexual relationship with a man she met in a homeless shelter whom, she later learned, tested HIV positive. Fearing that her nearly full term fetus would contact AIDS, she requested that the birth be induced.
At the time of Kristopher's birth, Arline admitted having used alcohol and marijuana but denied using cocaine. She tested positive, however, for cocaine as well as marijuana at the time of delivery, indicating use within the preceding 48 hours. (Testimony of Dr. Hodder, May 8, 1991).
Although nearly full-term and of normal height and weight, immediately after birth Kristopher went into seizures, evidencing signs of withdrawal from alcohol and drugs, respiratory distress and muscle spasms. Pediatrician Dr. Hodder testified that the infant demonstrated the "most severe I degree of effect from maternal prenatal drug abuse" he had seen in 17 years of practice. He described the infant's extreme irritability, agitation, writhing, arching, stiffness, constant movement that he termed "quite dramatic". He predicted that Kristopher would be at a higher than normal risk of neurological and developmental problems in the future, requiring careful monitoring and prompt response to signs of learning disability, hyperactivity, and developmental delays. He recommended against entrusting Arline with his care until there was evidence of lasting change in her behavior. CT Page 1644
Arline had sought prenatal care at Bristol Hospital early in her pregnancy and re-contacted that clinic on her release from prison in January 1991. Admitting using marijuana, she was warned that the case would be referred to DCYS if the child, at birth, tested positive for any drug.
Voicing signs of depression, she was also referred to Wheeler Clinic's Mobile Crisis Unit in early January. This clinic had known Arline two years earlier, following a brief psychiatric hospitalization at Cedercrest, and was aware of her drug history going back more than five years. (Testimony of Nancy Silver, May 8, 1991.)
The effects on an eight-month fetus of various drugs and medications, legal and otherwise, was discussed at length repeating the information Arline had received in a lengthy letter from the University of Connecticut at the outset of her pregnancy in response to her inquiry. The crisis social worker, Ms. Silver, met with Arline five times before Kristopher's birth and several times after. Although denying the use of drugs during the month before giving birth, Arline was referred to "Lifeline", Wheeler's program for substance abusing pregnant women.
At the "Lifeline" intake interview on January 15, 1991, Arline told Jane Dean, Wheeler's substance abuse therapist, that she had been a substance abuser for seven or eight years, had been in a number of programs and had completed two. She had spent 25 days in Greenwich Hospital in 1988 and was back on de-tox at Bristol Hospital in April of 1990. (Testimony of Jane Dean, May 29, 1991) Ms. Dean accepted Arline into "Lifeline", a twice-weekly program she could enter while pregnant and remain in for six months after giving birth. Arline agreed and entered the program a week later. Attending only five of the first 15 scheduled sessions, she was discharged from the program in mid-March of 1991. Twice she had called to say she had transportation problems, although transportation had been offered both by the Red Cross and through Medicaid. No reasons were offered for her having missed the other eight sessions.
One week after Kristopher's birth, Arline told the DCYS intake social worker that she had found an apartment in her own name and hoped for the return of both of her children. Having stopped intravenous drug use because of fear of AIDS, she admitted continuing to smoke crack. On the day of the mandated 10-day hearing on the OTC given February 20, 1991, the social worker's offer of transportation to court was accepted, but when she went to pick up Arline, the latter refused to open the door, saying she was sick and was not coming. (Testimony of CT Page 1645 Karen Brinkman, May 29, 1991.)
After spending his first three weeks of life in hospitals, Kristopher was placed in a DCYS foster home on February 26, 1991. Arline, who had visited her baby three times in those three weeks, did not request a visit for the first three months of his foster placement. On March 7, 1991 she had called the foster mother who told her to arrange visits through DCYS. She did not do so. On March 25, 1991 the newly assigned social worker, Lisa Sedlock-Reider, visited Arline at her apartment provided transportation to a pretrial conference held that day, and scheduled a visit for April 3, 1991. Ms. Sedlock-Reider made three telephone calls to various locations in the interim in an attempt to confirm the visit. Arline was never reached but messages were left that transportation would be provided for that visit. When the social worker went to the home on April 3, 1991 two men came to the door and reported that Arline was again sick. The mother then appeared and said she was very sick and would call to reschedule to visit.
When no call was received by DCYS, the social worker attempted to contact Arline by calling various acquaintances and leaving messages. During this time Kristopher became ill with an abscess, a staph infection, and muscle tension problems, but DCYS had no way to communicate this information to his mother other than by leaving the messages, to none of which was there ever any response. On April 24, 1991, two days after the social worker wrote Arline a letter urging her to initiate contact with her son (State's Exhibit F), she learned from Arline's probation officer that the mother had returned to prison on April 22, 1991. Arline did not call from Niantic to request a visit until May, when a visit was arranged to take place on the second trial date, May 29, 1991, at which time Arline saw Kristopher for the first time since his discharge from the hospital more than three months earlier. Since then monthly visits at the prison have taken place, and Arline began telephoning the foster home in August.
For more than three years before Kristopher's birth, DCYS had worked with Arline after receiving referrals on her care of her older child. Her parents complained in December of 1987 that Arline, then abusing both drugs and alcohol while living with them, would leave the child and disappear for days at a time. Arline, admitting the use of cocaine, moved out of her parents' home and into a shelter, taking her daughter with her.
The maternal grandmother obtained custody temporarily on a habeas proceeding because of problems of child care in the shelter, but Arline resumed care of her daughter for most of CT Page 1646 the year following. In January of 1989, however, DCYS became reinvolved on a complaint from a maternal aunt that Arline was using drugs and neglecting her daughter. Nothing was done until March of 1989 when DCYS intervened after receiving two reports that Arline had been wandering the streets with her then four-year old daughter while apparently under the influence of drugs or alcohol. She then agreed to transfer the child's custody to her sister through the probate court while she entered a substance abuse program at Greenwich Hospital (Testimony of Karen Brinkman, 10/24/91). She completed that program but was arrested two times in the year following (State's Exhibit H, third page) and by May of 1990 was pregnant with Kristopher. Arline's sister continues to have custody of the now-six year old daughter.
In July 1990, when two months pregnant with Kristopher and fully aware of her condition and advised by the University of Connecticut Hospital of the effects upon that condition of the various substances she was then taking (legal and otherwise), she was arrested for a knife assault on her male roommate. When the police arrived, she had been found passed out in a locked bathroom from the effects of both drugs and alcohol. After spending the next five months drug-free at Niantic, Arline obtained supervised home release in December of 1990.
She had given authorities a false address, where she knew the landlord would not permit an additional tenant, leaving her homeless two months before the expected time of giving birth. Living in shelters (a fact of which her parole officer was unaware) she resumed use of cocaine, alcohol and marijuana, and had sexual relations with a man she met in one of the shelters who, later, she learned had tested positive for HIV.
Clinical Evaluation: Arline had been brought from Niantic for an evaluation by court-appointed psychiatrist, Dr. Richard Sadler, board-certified in both child and adult psychiatry. His report was entered as the State's Exhibit C. On the day of the interview, Arline was in a neck brace and in pain from involvement in a riot at the prison. She acknowledged to Dr. Sadler having had "lots of psychiatric hospitalizations" and having "taken a lot of medication. I did a lot of drugs during the last part of my pregnancy." (State's Exhibit E, p. 2.) She presented a history marked by sexual and physical abuse by her father and others, the failure of her mother to protect her, failed relationships and, "intermittent but occasionally quite heavy" drug use. (Id., p. 3.) She stated that she had been drug and alcohol free during the first six months of her pregnancy, a fact in conflict with the probation officer's report at the time of sentencing. (State's Exhibit H.) She CT Page 1647 also acknowledged that when Kristopher was placed "she began to become still more heavily involved with drugs." (State's Exhibit E. p. 4.
She disclosed numerous involvements with drug dealers and users (Id.) and "approximately 20 hospitalizations for drug use or depression." (Id. p. 5.) She reported having been diagnosed as manic-depressive in her last hospitalization (April 1990) for which medication was prescribed and had proved helpful. She described a number of treatments, programs and counsellors consulted over the years, but the evaluator could detect no rehabilitative program had ever been sustained. (Id.) While he thought that a bi-polar disorder could contribute to her destructive behaviors, "it . . .is not adequate to account for the heavy drug abuse and repeated involvements with abusive men." (Id., p. 6.) Dr. Sadler found Arline to be a mildly depressed alcohol and drug abuser whose severe abuse suffered at the hands of family members and her many boyfriends ". . . has left a seriously emotionally impaired woman who . . . remains at grave risk for continuing her pattern of erratic and violently unpredictable behaviors which have been nearly continually aggravated by her drug use." (Id., p. 7.) While he found some strengths that suggested a possibility of rehabilitation some time in the future, he considered her when seen as being ". . . at grave risk of resuming drug use and becoming violent, unpredictable and unable to manage her own needs or her children's needs at any time in the future." (Id.)
While she acknowledged her own responsibility in the problems of her children, Dr. Sadler found her ability to sustain treatment or sobriety to be "quite questionable." (Id.):
 Ms. M. is a substance abuser and she has a severe personality disorder and most likely an additional affective disorder . . . [and] a personality disorder which leads her to display poor judgment and impulsivity and self-destructive tendencies. She has an affective disorder which further complicates and exacerbates her personality disorder. Her drug use complicates and aggravates both.
(Id., p. 8.) Notwithstanding "some possibility" of improvement through treatment for both her drug and psychiatric problems he concluded that "the probability of repeated relapses" was so high, and the time entailed to demonstrate lasting change would be so long that the risk for a child already compromised by her behavior would be "unacceptably high":
. . I do not believe that she is able to meet the immediate physical and emotional needs of an infant or a child, nor do I believe that she is likely to be able to consistently meet CT Page 1648 the needs of her infant within a time frame that would not do further serious harm to her infant. (Id.)
In his testimony Dr. Sadler repeated that while her strengths suggested some possibility of rehabilitation, "I seriously question her ability and motivation to rehabilitate." (Testimony of Dr. Sadler, July 24, 1991.) "Her words were so convincing; her behavior was not." Because rehabilitation within a time frame Kristopher could afford to wait was so unlikely, he recommended immediate termination of her parental rights.
Even if she were able to sustain sobriety over a period of months, that alone would not render her capable of adequate child care because of her underlying personality disorder which — unlike her treatable affective disorders (depression; bi-polar disorder) — are not responsive to psychotropic medication. The personality disorders are the underlying cause of her self-destructive behaviors and her ability to sustain stable employment, relationships, or housing. Dr. Sadler predicted that relapses were "much more likely than not" and therefore it would be unreasonable to require Kristopher to be exposed to such risk. The fact that she resumed drug use shortly before Kristopher's birth, after five months of sobriety in prison, coupled with her return to drugs after his birth until returned to prison, suggested that motherhood was not a motivating factor for Arline's treatment.
The psychiatrist retained by Arline, Dr. Carol Helman, with one year's experience as a board-eligible adult psychiatrist, found Arline to be in approximately the same psychological state as had Dr. Sadler three weeks earlier. To Dr. Helman, Arline reported an adolescence marked by sexual abuse by her father, being raped at 16 and 18, a first miscarriage at age 17, and a series of abusive relationships with men. (Respondent's Exhibit 1, pp. 1-2) Nonetheless she had never spent more than a few months between relationships with these men.
Her most lasting relationship began when she was sixteen and lasted for four years, during which her partner physically abused her, fractured her skull, broke her arm and physically abused their infant daughter. Immediately after ending that relationship, she embarked on another four year relationship. Although this man was not abusive it was during her time with him that she began using drugs, frequenting bars, and eventually losing custody of her daughter. The putative father of Kristopher was yet another man with whom she had a two year as he had requested. She was two months pregnant with Kristopher when she went to prison and immediately upon her CT Page 1649 release from Niantic, two months before giving birth, she embarked upon a relationship with another man and resumed using drugs. Notwithstanding her multiple physical and legal problems in the three months after Kristopher's birth, culminating in her return to prison in April of 1991, she informed Dr. Helman that she remained involved with this latest man and desired that relationship to continue. (Id., p. 2.) She "acknowledged chronic suicidal ideation and claimed she frequently experienced . . . [it] on a daily basis, "resulting in five or six suicide attempts. (Id., p. 7.) Arline was aware of available community support services (Id., p. 8.) and named a number of "friends of whom she regarded ZB, a woman she met in January of 1991 as her "best friend". (Id.)
As of the date of the interview (June 12, 1991) Arline acknowledged having seen her son only once since he left the hospital nearly five months — and that was the week before the evaluation during the first of scheduled monthly visits at the prison. Although "Arline did not seem to possess an understanding of the level or duration of treatment she requires . . . minimized any cocaine craving . . . [and] demonstrated a tendency to change her story, especially about her use and lifestyle, "denying or deleting significant aspects (Id. p. 9.), Dr. Helman came to the conclusion that . . . "with appropriate and intensive treatment it is also possible that [she] . . . can develop the necessary skills and internal strength to deal with her difficulties in a more constructive, less self-defeating fashion." (Id., p. 10.) Intensive treatment was defined as including medication, individual and group psychotherapy, an ongoing drug and alcohol treatment program which includes a structured day or night program. Such treatment would have to be court mandated, however, because Arline ". . . requires that kind of external structure at this point in her illness." (Id., p. 9.) Dr. Helman's recommendations were couched not in terms of what Kristopher needed but what Arline "deserved": ". . . she warrants an opportunity to try to achieve this before parental bonds are severed. . ." (Id., p. 10).
In her testimony of July 24, 1991, Dr. Helman listed as Arline's strengths (1) her understanding of her needs for pshychotropic medication . . . but did not allude to the fact that Arline stopped taking medication that had proved effective for her depression after Kristopher's placement; (2) her awareness of resources and how to use them . . . but did not comment on the fact that these resources were made known to her years before, in connection with the loss of her daughter's custody, and were not used in a way so as to prevent that child's removal; (3) her ability to disengage from bad relationships . . . but did not contrast this with her CT Page 1650 demonstrated inability to sustain good ones or her propensity to re-engage in new bad relationships; (4) her seeking advice from the University of Connecticut when she learned of her pregnancy with Kristopher in order to ascertain what substances she was then ingesting might harm the fetus . . . but did not comment on Arline's return to cocaine as soon as she was released from prison in the final two months of her pregnancy; (5) Arline's request for labor to be induced to minimize the risk to the baby of contacting AIDS . . . but did not balance this solicitude with the disregard for his welfare demonstrated ! by her engaging in sexual intercourse with a strange man met in a homeless shelter in the ninth month of pregnancy. Dr. Helman acknowledged that it was her opinion that all women who give birth, regardless of their histories or their children's condition at birth, should be given at least one year in which to demonstrate their rehabilitative capacity.
While acknowledging that Arline was at high risk of return to drug abuse if entrusted with Kristopher's care, she maintained his mother "deserves a chance". Asked how realistic it was to expect Arline to persevere in treatment when she had been unable to do so for the past twelve years, Dr. Helman responded, "I cannot say it is highly likely. . . Recidivism is the rule." (Testimony, July 24, 1991.) Immediately after stating that Arline should be given six to twelve months to demonstrate her ability to rehabilitate (presumably after her still uncertain date of release from Niantic), Dr. Helman added, "Arline's risk from relapse is high".
Testifying in her own behalf, Arline acknowledged that she had been released from Niantic in December of 1990 for supervised home release on the strength of an address given where she knew she would not be allowed to live. That meant that in the last trimester of her pregnancy with Kristopher, she deliberately put herself in a situation where she was homeless, moving from shelter to shelter. She explained her abuse of drugs after Kristopher's birth due to depression over the pending litigation in this court — but did not explain why she had returned to drugs after five sober months in Niantic, in the weeks immediately preceding his birth. She claimed she did not understand that cocaine would harm the unborn child notwithstanding that she had been sent a lengthy letter from the University of Connecticut, in response to her inquiry, which outlined the risk factor of every substance she had been ingesting: "I never even read it." (Testimony of Arline M. October 24, 1991.)
She stopped taking all drugs except for on antidepressant that was not harmful to a fetus, while she was in Niantic, but resumed using cocaine immediately upon her release because "I CT Page 1651 didn't know the exact risk." (Id.) She admitted visiting Kristopher only three times during his three weeks in the hospital after birth, and did not explain why she had told the psychiatrist she had retained that she had visited daily.
Conclusion of Fact:
1. Arline M. is a chronic, long term alcohol and drug abuser whose only periods of sobriety since Kristopher's conception in May of 1990 were during incarcerations;
2. Herself a sexually abused child, Arline has had a 10 year pattern of abusive relationships with men, punctuated with episodes of violence resulting in her spending 11 of the 17 months between Kristopher's conception and the final day of, trial in prison; during the other six months (four before Kristopher's birth; two after) she used cocaine, marijuana and alcohol.
3. In addition, Arline suffers from both affective disorders (depression; bi-polar disorder) treatable with medication, and an underlying personality disorder less amendable to treatment. She discontinued psychotropic medication, even when demonstrably helpful, and has never sustained involvement with any form of treatment either for her substance abuse or psychiatric problems.
4. Her use of drugs immediately before his birth caused Kristopher to suffer the most extreme adverse reaction that the only pediatric expert witness to testify had seen in 17 years of practice.
5. Arline is at high risk of reverting to substance abuse upon her as yet undetermined release from Niantic.
6. As a result of his mother's use of cocaine immediately before his birth, Kristopher is at a risk of developmental, neurological and educational problems in the future, requiring a high degree of close observation and prompt response by his principal caretakers.
7. Arline has done nothing to regain the custody of her oldest child whose care she had assumed for that child's first three years, and whose custody was removed two years before the institution of this litigation.
Adjudication — On Facts as of May 8, 1991, date Petition was Last Amended
Neglect Petition — The foregoing facts support by a CT Page 1652 preponderance of the evidence all of the grounds pleaded for finding the child both neglected and uncared for. The mother's deliberate use of cocaine in the final days of her pregnancy resulted in the extreme symptoms vividly described by Dr. Hodder. Had a mother of a newborn injected the baby's veins with cocaine immediately after birth, resulting in such visible damage to the infant, no one would question a finding of deliberate child abuse; the fact that the cocaine was introduced into the child's veins a matter of hours before rather than after, birth does not preclude a finding of neglect. In Re: Valerie D., July 24, 1991 (17 Conn. Law Tribune 44, p. 967.) attached hereto; affirmed 25 Conn. App. 586
(August 27, 1991), motion to reargue denied November 5, 1991; certiorari granted 221 Conn. 903 (January 21, 1992). This evidence also satisfies the definition of neglect as found in46b-120 as being a condition which is the result of maltreatment. Kristopher is also uncared for in the sense of having specialized needs which his mother cannot meet, not only those caused by his in utero exposure to cocaine but also those of normal infancy (In Re: Carl O., 10 Conn. App. 428, 435
(1987) as well in the sense of being homeless since his mother, while briefly renting an apartment in her own name, was demonstrably incapable of providing for the needs of this infant due to her chronic and severe drug abuse problem and recurrent arrests, and "home" for a newborn requires adequate physical space AND a competent caretaker.
This evidence also supports the further ground added by the petitioner's amendment of May 8, 1991: Three visits in the child's first three weeks of life and no visits or requests for visits in the next two months, constitutes abandonment under the definition of neglect found in 46b-120. Termination Petition — the foregoing record also supports, by clear and convincing proof, all three grounds pleaded for terminating Arline's parental rights:
(1) With full knowledge of the effect of cocaine upon the unborn, and after five months of enforced sobriety in prison, Arline deliberately returned to using cocaine in the final weeks of pregnancy, with the result she had been warned of repeatedly: serious trauma to the newborn infant. She also embarked upon a sexual relationship with a man she met in a homeless shelter in her last month of pregnancy whom she later learned tested HIV positive. This conduct constitutes a denial, by reason of the mother's acts of both commission and omission, of the care, guidance or control necessary for the child's well-being.
 "Nonaccidental . . .serious physical injury to a child shall constitute prima facie evidence of acts of commission or CT Page 1653 omission sufficient for the termination of parents rights." (Subsection (3) of 17a-112 (b).)
(2) There can be, between any newborn and its mother, no existing parent-child relationship as defined in 17a-112 as "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." That fact alone, of course, is not a ground to terminate any parent's rights. The development of such relationship — the necessary "bonding" between parents and a newborn — takes time, and on this record the proof is both clear and convincing that "to allow further time for the establishment of such parent-child relationship would be detrimental to the best interest of the child." The mother did nothing, in the first three months of the child's life, to develop such relationship by daily visits and participation in his ordinary care. She could have travelled daily to the hospital during Kristopher's three-week stay there; transportation being provided by the Red Cross, a Medicaid cab or her friend. After his discharge from the hospital on February 26, 1991, Arline did not ask for a visit.
 And by returning to drug abuse, violence and re-incarceration, she selected a course of action which delayed the establishment of such bonding far into the future. With Arline's discharge date from prison still undetermined as of the dispositional date five months later, and with a history of an immediate return to drug abuse following her most recent incarceration, the waiver of the full twelve months is clearly demanded by the totality of circumstances surrounding this child in order to promote his best interests, as permitted in subsection (c) of 17a-112. To make an infant wait for twelve months before being assured of a permanent home under these circumstances because of a statutory requirement that was clearly unintended by the legislature (see Appendix A to the memorandum of decision in In Re: Valerie D., attached hereto) would mean putting the parent's interest in every instance ahead of those of the child.
(3) The petitioner added the grounds of abandonment by amendment granted May 8, 1991 when the mother, throughout the child's first three months of life, had clearly "failed; to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child", as abandonment is defined in 17a-112 (b). As of the date of that amendment, Arline had reverted to the kind of conduct that had resulted in 13 arrests in two years, entailing two periods of incarceration. By her own conduct she put CT Page 1654 herself in a position where she would be unable to begin establishing any parent-child bond, during Kristopher's critical first months of life. See In Re: Reyna M., 13 Conn. App. 23, 34 (1987) under these circumstances and given the high degree of probability that her pattern of the preceding 10 years will not significantly change upon her release in the indefinite future, a waiver of the twelve months required by subsection (b) of 17a-112 is clearly to promote the best interest of the child." Subsection (c) of 17a-112.
Disposition — As of October 24, 1991, Final Trial Date.
The only change in Arline's situation in the five months between the adjudicatory and dispositional dates is that monthly visits at the prison were begun in June of 1991. Her release date from Niantic is as yet uncertain.
In July she was arrested again for conduct occurring during her incarceration of the same nature (physical violence toward other adults) as that which caused so many of her arrests in the past. Her plans upon release are unclear. More than eight months after Kristopher's birth, his mother is in the same situation that she was in before his birth: Sober and articulating her desire to make a home for her children . . . while incarcerated, but with no evidence that sobriety will continue, or that her desire will be put into effective action when she is released from prison.
Before the court may consider terminating a parent's rights, however, it is necessary to consider the six factors set forth in subsection (d) of 17a-112:
(1) DCYS went to extraordinary lengths to facilitate Arline's resumption of Kristopher's care: No requested visit was ever denied. Appropriate rehabilitative programs were made available. Transportation to visits and to court hearings was offered. Having been involved with Arline four years earlier in connection with her older child, she had been made aware long before Kristopher's birth of available resources and of the consequences of her failing to maintain freedom from substance abuse when not incarcerated. Considering her unavailability for contact with DCYS during Kristopher's early precarious months of life, no further services could have been offered or provided to Arline to facilitate reunion with her son.
(2) No court orders were entered into, except for Arline's attendance at court and for her clinical evaluations, with which she complied. While not a court order, Arline had CT Page 1655 been warned repeatedly of the impact upon her children — born and not yet born — of her continued use of drugs.
(3) Kristopher could have no feelings or ties with a mother who failed to visit him more than once a week during his earliest weeks of life when hospitalization was required, and not at all during his first three months in foster care following discharge from hospital. At the age of only eight months (as of the dispositional date) no one has exercised care, custody or control for at least a year.
(4) Every child needs stable nurturing from the moment of birth for the first critical months of life, and for the preschool years that determine ultimate adjustment to life. Kristopher, whose birth was seriously jeopardized by his mother's use of drugs within days of birth, has even a more pressing need for a stable, secure and sensitive permanent home at the outset of life. He is at high risk of developmental problems in the future and requires a higher than ordinary degree of sensitive and responsive caretaking. Unlike children born without the trauma experienced by Kristopher at birth, he cannot afford multiple changes of caretaker or abortive returns to marginally competent relatives. To maximize whatever potential he may possess, Kristopher needs a permanent home with competent caretakers immediately.
(5) Arline has made no visible effort to adjust her circumstances, conduct or conditions to make it in Kristopher's best interest to place him (not "to return him") to her home in the foreseeable future. She only initiated regular contact after going back to prison, electing to see him not at all during his first three months in foster care. She did not maintain any contact or communication with DCYS, his temporary custodian, until she returned to prison; on the contrary, despite extraordinary effort, DCYS was unable to make contact with her in early April, even when he had serious health problems. Most significant is Arline's failure to address her substance abuse problems with any consistency. She has entered a number of brief programs, but sustained none on an outpatient basis. She was warned repeatedly of the effect of drugs on her unborn child, but returned to cocaine abuse as soon as she was out of prison in December of 1990. She admitted benefiting from anti-depressant medication, but stopped using it without giving any reason after Kristopher's birth.
(6) Arline was prevented from maintaining a meaningful relationship with the child in part because of the CT Page 1656 intervention of DCYS in securing temporary custody, and in part because of her own problems that kept her from visiting her son in his early months of life. The former intervention was not, however, unreasonable considering Kristopher's condition at birth and his mother's demonstrated unamenability to treatment.
Having considered the foregoing it is found, by clear and convincing proof, to be in the best interests of Kristopher M. for his mother's parental rights to be terminated so that he may be placed in permanent adoption with competent — caretakers without further delay. Therefore, it is ORDERED that the parental rights of Arline M. in and to her son Kristopher M. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said child in adoption without delay, and to further this end such Commissioner is further ORDERED to submit to this court a written report as to the progress toward such adoption no later than 90 days following the date of this judgment. If adoption has not been finalized by May 1, 1993, the said Commissioner is further ORDERED to submit to this court a Motion to Review Plan for Terminated Child, to be in conformity with federal law.
Appeal
Arline M. has 20 days from the date of this judgment in which to take an appeal. If she requests an appeal and her trial counsel is willing to represent her, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merits, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book #4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The parties will then be informed by the court clerk that they have the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965). CT Page 1657
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest to at least as great a degree of consideration as those of the parent whose right to raise the child is at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Hartford this 10th day of February 1992
FREDERICA S. BRENNEMAN, JUDGE